### KAY PATENTS CORP. v. MARTIN SUPPLY CO., Inc. et al.

No. 5218.

United States District Court
D. Maryland, Civil Division.

June 12, 1952.

Nyburg, Goldman & Walter, Baltimore, Md., Mock & Blum, New York City (Raphael Walter, Baltimore, Md., Asher Blum, New York City, of counsel), for plaintiff.

Kenyon & Kenyon, New York City (Theo. S. Kenyon & Edward A. Ruestow, New York City, of counsel), for Sylvania Products, Inc.

Frank & Oppenheimer, Baltimore, Md. (Howard H. Conaway, Baltimore, Md., of counsel), for Martin Supply Co. Inc.

CHESNUT, District Judge.

This is a typical patent infringement case with the usual defenses of invalidity of the patent and non-infringement.

The trial of the case occupied five full days in April and May 1952. The transcript of the record embraces 742 pages and in addition thereto there are several hundred pages of depositions. The plaintiff has filed 34 exhibits and the defendants have filed 17 exhibits.

I have separately stated findings of fact and conclusions of law. It is not my purpose in this opinion to undertake a detailed review or discussion of the voluminous record, but only to state the principal reasons that have led me to the conclusion that the patents are invalid and also have not been infringed.

A reading of the findings of fact will show the nature of the patents and in some detail the construction of the plaintiff's and defendants' respective devices. The plaintiff's patents and their reduction to commercial use relate only to the sockets or holders for a certain recently developed type of fluorescent lamp. It will possibly contribute to a better understanding of the subject matter if a short explanation is given, in non-technical terms, of the development of fluorescent lamps as now known.

Fluorescent lamps for lighting in offices and homes have now been in use since 1938. As is well known, the lamps consist of cylindrical glass tubes suspended in fixtures usually attached to the ceiling. Each end of the glass tube is fastened into a socket which in turn is connected

by a switch to the electric circuit, the power for which comes from the ordinary office or house electric current usually of a voltage of 110 to 120 volts. In the early types of these lamps, and indeed even presently in over 90% of those in use, the glass tube is of small diameter and of only two or three feet in length; but a number of such lamps may customarily be placed in one fixture suspended from the ceiling. Within the glass tube at each end is an electrode which, when sufficiently heated, allows an electric current to spark or jump from one end of the tube to the other and to illuminate the room with the help of a gas and a coating of powder within the lamp. In the early type of lamp, as in the case of the large majority now in use, each end of the lamp has on the outside two pins which fit into openings in the respective sockets or holders for the lamp, and when the lamp is rotated by hand in an arc of 90 degrees the lamp becomes more securely affixed to the socket and makes contact with the electric circuit which operates when the wall switch is afterwards turned on. This operation of connecting the lamp to the electric current is not unlike the similar and simpler operation of placing the end of a floor lamp into the baseboard or wall socket provided therefor. As the voltage is comparatively small it requires a slight interval of time, a second or two, for the electrode in the lamp to become sufficiently heated for the current to jump and the lamp to light. This occasions the well known temporary flicker of the lamp before it becomes thoroughly luminous. This type of lamp is, therefore, frequently not what can be called an "instant starting" lamp.

To overcome this temporary flicker, a new type of fluorescent lamp has in recent years been devised. This new type of lamp is called an "instant starting" lamp. It is also larger in diameter and may be much longer in length up to possibly eight feet. For the instant starting a much higher voltage is required, say about 800 volts. To obtain this higher voltage from the ordinary office or house current of 120 volts, it is necessary to place a so-called "transformer" in the electric circuit to which the lamp is connected. This transformer consists of a coil in the circuit in which a current is induced by the ordinary house current. The much higher voltage so induced in the secondary circuit causes the instant starting of this new type of lamp, and the transformer serves in the nature of a governor of the voltage which is not required to be so high during the continued operation of the lamp.

The new type of fluorescent lamp was first developed by the General Electric Company in 1944, during the latter part of the second World War. The new lamp type differed from the earlier type also in that on the outer ends of the lamp, instead of two pins or prongs to fit into the lamp socket, there was only one pin provided. The announcement of the new type of lamp naturally indicated to lamp manufacturers that a new type of socket for holding the lamp would be necessary. Therefore it was entirely natural and to be expected that almost immediately after the announcement of the new type of lamp, various lamp manufacturers started to design new sockets or holders for the new lamp. Thus almost at the same time, in July, August and September of 1944, the Kulka Company, the substantial plaintiff in this case, and the Sylvania Electric Products, Inc., the substantial defendant, and also the Bryant Company, a subsidiary of Westinghouse, and the General Electric Company all occupied themselves with designs for the production of lamp sockets suitable for the new type of fluorescent lamp. During the pendency of continued military operations and for some time thereafter, the limited supply of materials available for new fluorescent lamp manufacture prevented any large commercial output of the new type of lamps and the appropriate sockets therefor. But in 1947 and later years, the larger available supply of materials has resulted in a much larger production of the new type of lamps with the type of sockets appropriate therefor. From the physical exhibits filed in the instant case it does not appear, at least to the layman, that there is any very material apparent difference between the sev-

eral types of manufactured new sockets represented respectively by the devices of the Kulka Company, the Sylvania Company and the Bryant Company, a subsidiary of Westinghouse. Only one of the companies working on the new type of socket applied for a patent on their device, with a minor immaterial exception. That one was Kulka whose patent application was filed April 5, 1945 and the patent issued by the Patent Office March 15, 1949. None of the other Companies applied for a patent because, according to some of the evidence at least, the particular form of socket produced by them respectively was not considered an invention or patentable. However, the Kulka Company was the first one to produce its type of socket for commercial sale in a substantial amount, and during 1948–50 it sold them in very large quantities amounting in the latter year to 2,000,000 pairs of sockets, but with considerably reduced volume of sets in 1951 after the other Companies mentioned had substantially increased their output. In this connection it is also to be noted that while Sylvania and Westinghouse are much larger industries than Kulka, the proportion of lamp socket business of Sylvania is only about 1% of its total business, which is largely that of the manufacture of radios and television sets.

In studying the patent questions involved in this case, it is important, in order to avoid temporary confusion, to understand that the first and early designs of the new sockets by the several competitors have undergone changes from time to time in the four or five years that intervened between the original conception of the matter and their present commercial product. This is true with respect to all of the competitors but particularly so with regard to the Kulka Company. There is quite observable difference in the structural appearance of the present Kulka device as compared with its earlier product which is itself described in the first patent, No. 2,464,643.

It is also important to bear in mind that the Kulka patents in this case have nothing whatever to do with the electric circuits, as to which there is no claim of anything new. The problem was to meet the changed conditions of the new type of lamp of much larger size and weight and therefore requiring more care in placing it in the fixtures and also that the presence of only one pin at each end, instead of two pins or prongs as in the original lamp, required a different arrangement of the sockets. Also the much higher voltage temporarily required for instant starting of the new lamp required more care in affixing the lamp to avoid any possible danger from accidental contact with the higher voltage. Even the ordinary house current voltage of 120 volts may cause serious discomfort if not actual injury upon contact therewith. The required design for the new lamp socket was also importantly affected by the requirement of the Underwriters Laboratories, that in order to avoid possible danger from fire or other harmful contact with the higher voltage, provision should be made that the new sockets should be designed in such a way that the higher voltage would not be brought into operation until the lamp was fully in place at both ends. In other words, the requirement of the Underwriters Laboratories, the approval of which is practically necessary for such devices, was that the so-called secondary circuit should remain open until the lamp was fully in place. And this latter statement makes it advisable to point out, in considering the evidence and exhibits in this case, that the current caused by ordinary house current is called primary current; while the larger voltage induced by the primary circuit is called the secondary circuit. And to avoid further confusion of terms, it is important to understand that the socket which opens the primary circuit is called the primary socket; while insertion of the lamp into the secondary socket does not close the circuit but it remains open until the lamp is also inserted in the primary socket. The confusion is to be avoided because of the similarity of sound in the pronunciation of "socket" and "circuit".

I come now to a consideration of the plaintiff's first patent. It was applied for by Eugene H. Kulka April 5, 1945, and granted to him March 15, 1949. It is numbered 2,464,643. It is entitled "Holder for Gaseous Discharge Lamps". In the patent specifications Kulka says:

"My invention relates to new and improved holder-socket means for holding 'fluorescent' lamps and other gaseous discharge lamps, and for connecting said lamps to an alternating current power circuit.

"The invention relates particularly to holder-socket means for a gaseous discharge lamp which is operated at high voltage, such as 600 volts–1,000 volts or more. The accidental touching of such a high-voltage contact results in serious injury or death.

"A lamp of this type has a single external metal contact head or prong, at each end thereof. Such lamps do not require starters. *I provide a primary holder-socket and a secondary holder-socket for each lamp.* The high and dangerous voltage is applied to the terminal of the secondary holder-socket. This high voltage is secured for example, from the secondary section of a step-up auto-transformer. This high voltage secondary circuit remains open, until a lamp is inserted into the two holder-sockets, whereby the secondary circuit is closed through the lamp itself. When the lamp is inserted, it covers and obstructs the high-voltage contact, thus preventing accidents.

"Numerous additional objects and advantages of my invention will be stated in the annexed description and drawings, which illustrate one embodiment thereof. * * *

"In order to connect the lamp to the secondary current circuit, it is necessary first to insert the contact head 3a into the secondary holder 17 through its open insert end and to push the bushing 18 inwardly against the biasing force of spring 19. This is done by the pressure of head 3a against the respective wall or portion of metal cup 20 which crosses the bore of the bushing 18. The bushing 18 must be pushed inwardly of the position shown in Fig. 1, in order that the lamp 1 can be horizontally located, with its head 3 located externally to the primary holder 7. The head 3 is then inserted into the primary holder 7, through its open insert end, so that said head 3 projects through the bore of the fixed insulating partition or washer 21, which then abuts head 2, to act as a stop. The free ends of the contact springs 9 and 9a then enter the groove G of head 3, thus making good contact." (Italics supplied.)

Claim 1 reads as follows:

"1. In gaseous discharge lamp service assemblages, wherein the lamp presents its external contacts at the ends of the lamp with the contacts axially alined, wherein the lamp is supported within secondary and primary holder casings with the holders positioned respectively within the external contact zones of the lamp, and wherein the lamp is rendered active by controlled alternating current supply actively applied thereto through said holders with the supply including an auto-transformer assembly operatively connected with the holders to provide the primary and secondary circuits utilized in rendering the assemblage active, an assemblage of such type characterized in that the secondary and primary holder casings are of insulating material and are secured in definitely spaced relation and each operatively related to the auto-transformer circuits to apply the secondary and primary circuit values to a positioned lamp through the respective holders, *each holder including an inlet opening for receiving a lamp external contact end zone with the inlet openings facing each other,* each holder also having an internal supporting member of insulating material for a lamp external contact with the members located relative to the inlet openings, the supporting member for the primary holder being fixedly positioned, the supporting member for the secondary holder being *movable yieldably* away from its inlet opening and carrying a contact member carried by and movable with the supporting member, said contact member being spaced from the holder inlet opening by its supporting member, said movable supporting

member being supported by a *biasing spring* operatively connected to the secondary circuit and to said contact member to form an element of the secondary circuit, said primary holder having a pair of individual permanently-spaced contact springs positioned for operative contact with an external contact of the positioned lamp and mounted for primary circuit activity in presence of such positioned lamp with one of said contact springs active within both primary and secondary circuits." (Italics supplied.)

Plaintiff also relies on claims 2, 3, 4 and 5, which are called "dependent" claims, but as they have been little discussed by counsel and as I find nothing of real importance therein in addition to Claim 1 (and nothing of itself constituting invention) I shall not undertake to further discuss the other claims.

The plaintiff relies on its first, 643, patent as the principal one. It is not apparent from a reading of the patent just what is the invention that is claimed; but plaintiff's counsel contends that it consists in the whole "combination" entering into the sockets and that its constitutes "a combination" which produces new and useful results, while counsel for the defendant contends that it is a mere "aggregation" of old elements. On this issue it is important to bear in mind what was said by Mr. Justice Jackson in his opinion for the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 150, 151, 152, 71 S.Ct. 127, 129, 95 L.Ed. 162:

"What indicia of invention should the courts seek in a case where nothing tangible is new, and invention, if it exists at all, is only in bringing old elements together? * * * The concept of invention is inherently elusive when applied to combination of old elements. This, together with the imprecision of our language, have counselled courts and text writers to be cautious in affirmative definitions or rules on the subject. * * * Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. * * * Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

Despite the presumption of validity from the grant of the patent, it is invalid for lack of invention, in my opinion. To avoid confusion it is important to note that the patent relates only to the construction of the sockets. The electrical circuit connected therewith is not novel and is not claimed to be novel by the plaintiff. Nor does the patent have anything to do with the lamps themselves.

When we examine the patent specifications and drawing and read the claim we find that what is claimed as invention is the particular form of construction of the sockets themselves; and to avoid confusion it must be noted that we are not here dealing with the plaintiff's present commercial device but with the drawings and wording of the first patent, 643. The noticeable thing is that the plaintiff provides two separate sockets, one called primary and the other secondary, and that the housing of the secondary socket it slidable or yieldable when one end of the lamp is inserted into it. It seems to be the contention of plaintiff's counsel that this is the feature of the patent which shows invention. And this point was emphasized during the trial of the case by colloquy between the court and plaintiff's counsel in which the latter stated that if the Sylvania sockets were both slidable or yieldable there would have been no suit for infringement. The particular wir-

ing design of the first Kulka patent seems to present no unusual features or at least none that could be considered to constitute an invention. The wiring described is only that which is suitable for the kind of lamp having one pin, and as such, the wiring arrangement seems to be clearly within the range of skill of a mechanic familiar with electrical wiring.

With regard to the feature of fixed socket and slidable socket, there is no novelty in view of the prior art. On this point the Sparling patent (1942) (application July 24, 1940, granted June 2, 1942, No. 2,285,175 for a lamp socket) in column 6, line 6, (p. 3) et seq., discloses:

"Obviously the end plate of one socket of each pair can be fixed and non-movable and the lamp can be inserted by pressing one end portion of a lamp tube into the socket having the movable end plate * * * and then letting the lamp tube move back toward the socket with the non-movable end plate * * *. It is thus seen that at least one of the sockets of each pair is to be provided with resilient means to allow an end portion of the lamp tube to be inserted thereinto in applying the tube to or removing it from the receptacles."

Nor is the Kulka patent limited to a pair of sockets of which one is fixed and the other is slidable because in column 4, lines 39–41 Kulka says:

"In this aspect of my invention, it is not limited to the preferred structure illustrated herein, in which all the internal parts of the holder 7 (the primary holder) are fixed, * * *."

As heretofore stated in the findings of fact, the prior patents to Russell, September 15, 1942, No. 2,295,757, and to Ranney, February 19, 1946, application April 29, 1944, No. 2,395,145, also show features contained in the combination of the first Kulka patent.

The chief criticism by plaintiff's counsel of these prior art patents is that they related particularly to so-called two-pin or the earlier type of fluorescent lamps. But it would seem obvious enough that this is not a real or important distinction. Naturally the precise arrangement of a lamp socket to receive a one-pin lamp will vary somewhat from that suitable for a two-pin lamp. But this causes no material difference with respect to fundamental change in the nature of the wiring to produce the contact which causes the flow of electric power and is clearly enough a matter within the skill of an electrical mechanic. And this would seem to have been recognized by Kulka in his patent which indicates that his arrangement of lamp sockets is not intended to be limited merely to a one-pin or a two-pin lamp. Thus in column 4, lines 56 to 60 of the patent, he says:

"The lamp" (to be used in his sockets) "may be of a type which has more than two contact-heads. Hence, when I specify a lamp which has a pair of contact-heads, the invention is not limited in this respect, as it includes a lamp which has more than two contact-heads."

Possibly it may be gleaned from the Kulka patent that a more important feature of his sockets was that which made it impossible to fasten the lamp into both sockets unless one end of the lamp was first inserted into the secondary socket. If the other end of the lamp was first inserted into the primary socket the length of the lamp was such that the other end could not then be inserted into the secondary socket because the slidable or yieldable portion of the secondary socket was contained entirely within the outer shell or housing of the secondary socket, and thus when attempted to be fixed into the secondary socket would overlap the outer housing and could not be inserted. Therefore, to place the lamp into a fixed position in both sockets it was necessary to first insert the end portion or so-called zone or ferule of the lamp into the opening in the slidable portion of the secondary socket and, on pushing this down against the helical spring resisting it, a portion of the length of the lamp end became inserted within the outer casing of the secondary socket, and thus by shortening the length of the lamp outside of the secondary socket, allowed the other end to be inserted into the opening in the

primary socket, and the resilient pressure of the spherical spring in the secondary socket would push the lamp forward until the other end became fixed in the primary socket. It seems to have been Kulka's idea that this necessity of placing one end of the lamp first in the secondary socket was of importance in lessening or avoiding the possibility of dangerous contact with the higher voltage generated by the circuit for the purpose of instant starting of the new type of larger fluorescent lamps. The contact wiring which starts the flow of the electric current is such that when the lamp end is inserted in the secondary socket the electrical circuit is not closed but remains open until the other end of the lamp is positioned in the primary socket. In other words, to start the flow of electricity in the circuit the contact heads of the lamp must be connected with the wiring in the primary socket. This starts the flow of electric current in the primary circuit which induces through the transformer the heavier voltage of the secondary circuit.

But it is to be importantly noted that this feature of the Kulka first patent seems to have been substantially abandoned in the present Kulka commercial device which makes it possible by hand to operate the yieldable feature of the secondary socket and thus insert one end of the lamp into the secondary socket after the other end has first been placed in the primary socket. It is true that plaintiff's counsel says that this is not the advised or desirable order of events in positioning the lamp fully in place, but it is quite apparent from an examination of the Kulka modern device that it is entirely possible to do so. It is also to be noted on the point of alleged infringement that the defendant's socket arrangement has never presented this particular feature of the first Kulka patent.

Much of the argument of plaintiff's counsel in this case has been devoted to the contention that Kulka was the first inventor of the present socket forms and that neither Sylvania nor Bryant nor General Electric anticipated him. Radio Corp. of America v. Radio Engineering Labs. Inc. (DeForest patent) 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453. I do not think it necessary in this opinion to review the evidence beyond what has been stated in the findings of fact, because the argument incorrectly assumes the validity of the Kulka patents. The defendant's contention is *not* that its device *anticipated* the plaintiff's, but is that there was *no invention in any of the devices*. Neither Sylvania nor Bryant (with an immaterial exception) nor General Electric has ever applied for a patent on any of these devices. Plaintiff's counsel contends that this failure to apply for patents by them is significant because, as he suggested, they are "patent minded" companies. But to me the evidence in the case clearly justifies the assumption that none of the parties other than Kulka thought that the socket arrangement in question presented any real invention, but was merely an adaptation of old forms to a new situation consequent upon the larger type of fluorescent lamps involving the heavier electric voltage for instant starting. In other words, the defense in this case is not anticipation of patentability but lack of patentability.

As appears in the findings of fact, these several lamp socket manufacturers were all working on the same general idea about the same time. And when in 1948 and later the new type of lamps became available in large quantities the several companies, Kulka, Sylvania, Bryant and General Electric, had developed and were ready to produce the new types of sockets which were substantially similar. The several companies were acting independently of Kulka and presumably of each other. At least there is no charge in this case by Kulka that Sylvania has by piracy or other unfair competition traded on or benefitted by Kulka's work. These facts lead logically to the view that where the independent contemporaneous work of several persons has had similar results, it is strongly persuasive that what has resulted is not due to invention but to the mechanical skill of competent workmen in the same field. Thus in Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 45, 70 L.Ed. 222, Mr. (later Chief) Justice Stone said:

"The adaptation independently made by engineers and builders of these fa-

450

miliar appliances to the movement and distribution of [wet] concrete cement in building operations and the independent patent applications, within a comparatively short space of time, for devices for that purpose are in themselves persuasive evidence that this use, in combination of well known mechanical elements was the product only of ordinary mechanical or engineering skill and not of inventive genius. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438. It is but 'the suggestion of that common experience, which arose spontaneously and by a necessity of human reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal.' Hollister v. Benedict Manufacturing Co., 113 U.S. 59, 72, 5 S.Ct. 717, 724 (28 L.Ed. 901)."

And in McElrath v. Industrial Rayon Corp., 4 Cir., 123 F.2d 627, 629, Judge Soper said:

"This is a question of fact; and since the evidence shows that a number of persons in the industry in different parts of the country had no difficulty in effecting the desired change when the need for it became apparent, the answer is that the change involved mechanical skill rather than invention."

As I have concluded that the Kulka patent 643 is invalid for the reasons stated, it is not really necessary to discuss the question of infringement although, as appears in the findings and conclusions separately stated, it is also my opinion that the first Kulka patent has not been infringed by Sylvania. In addition to what has been pointed out in the findings of fact, and also to some extent in the above opinion, attention may be called to the fact that in the portion of claim 1 of the patent as above underscored, the element of the patent claim there involved is not found in the Sylvania accused device which constitutes plaintiff's Exhibit 3 and 4 in the evidence. The language of the underscored portion is as follows:

" * * * each holder including an inlet opening for receiving a lamp external contact end zone with the inlet openings facing each other * * *."

It is a part of claim 1 which consists of 315 words occupying 42 lines and all in one sentence and without punctuation other than commas. That phrase is an element of the plaintiff's claim which is omitted in the defendant's device and would seem to be an element which is necessary to a socket construction which, as heretofore explained in this opinion, prevented the positioning of the lamp in the two sockets by first placing one end in the primary socket. And it may be noted that this element of the first Kulka patent does not appear in either the defendant's structure or Kulka's present product. In other words, it seems to have been abandoned by Kulka for commercial use and its abandonment is suggestive that it was a hollow claim for patentability. But however that may be on the issue of infringement it is an element which has been omitted from the defendant's structure without the substitution of an equivalent element in a way to achieve the same result. See Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 4 Cir., 139 F. 312; Montgomery Ward v. Rogers, 4 Cir., 100 F.2d 721; Bailey v. Galion Iron Works, 4 Cir., 80 F.2d 805, 807.

The second Kulka patent No. 2,-495,196 applied for December 18, 1948 and granted January 17, 1950, does not require lengthy discussion. Apparently the principal purpose of this patent was the design for a socket that would accommodate fluorescent lamps of different sizes. It will be remembered that the design of the secondary socket under Kulka's first patent was such that the whole end zone of the lamp was inserted within the outside shell or housing of the socket. But when the new type of instant starter fluorescent lamp became available in quantity in 1949, many of them were of much larger length and diameter. The idea of Kulka's second patent was therefore to design a socket which, among other things, would permit the insertion in the secondary socket of the contact end or pin at the end of the lamp in

a small opening in the socket. Thus one pair of sockets of uniform size would be available for lamps of various sizes.

This is explained in the specifications for the patent. After referring to Kulka's co-pending first patent the specifications in column 1, lines 30, et seq., said:

"Gaseous discharge lamps having a single external contact head are manufactured in several lengths, and of several diameters. Such lamps are now made with diameters of 1½ inches, one inch, and ¾ inch, and, according to present indications, lamps having greater diameters will eventually appear upon the market. The diameters of the hollow heads which connect the contact heads to the envelope of the lamps vary correspondingly with the diameters of the lamp envelopes.

"The conventional lampholders for lamps of this type are commonly provided with a peripheral flange in the front wall into which the hollow heads of the lamps are adapted to fit snugly, in order for the contact heads or prongs to make contact with the internal circuits of the holders. Since the diameters of these hollow heads increase as the diameter of the lamp increases, it has heretofore been necessary to change the lampholders in the fixture every time the diameter of the lamp was changed. In addition, this requirement has caused serious inconvenience to dealers and manufacturers who must carry a complete line of lampholders for each size of lamp.

"In lamps of this sort, the contact heads or prongs are made of a uniform size and diameter regardless of the size and diameter of the hollow heads or the envelopes.

"I provide a pair of lampholders which may be effectively used to hold a lamp of the aforementioned type, no matter what its size or diameter, and in which lamps of various diameters may be used interchangeably."

The patent contains 8 claims. The plaintiff first declared on claims 1, 2, 6, 7 and 8 but has now limited its charge to claim 6, which reads as follows:

"6. For use in holding one end of a lamp which has respective external and parallel and longitudinally-alined and conductive contact heads, a casing made of insulating material and comprising a base, a hollow member which is telescopically slidable over said base, and an internal conductive spring which biases said hollow member away from said base, said hollow member having at least one longitudinal inlet-opening, and a contact member which is fixed over said inlet opening in a position to contact with a respective inserted contact head of the lamp, said base having a conductive terminal, said spring touching the conductive terminal at one end and the contact member at the other end, *said base having an externally projecting periphernal flange, said hollow member having an internal peripheral resilient ring, said ring being positioned to abut said flange when said hollow member is biased away from said base and to prevent said hollow member from leaving said base.*" (Italics supplied.)

It is the underscored portion of the claim on which principal reliance is now made by the plaintiff. But it is not contended that the so-called "split ring" is itself new. Nor do I see any novelty even approximating invention in the particular arrangement of the ring in the socket or the purpose for which it is so used, being simply to prevent the two parts of the sliding or yieldable socket from separating.

It seems not to be seriously disputed by counsel for the plaintiff that claims 1 to 5 of this second Kulka patent were invalidated, if they otherwise had validity, by the grant of the patent to Kurtzon, allowed July 17, 1951, No. 2,560,-877, applied for January 3, 1947, the latter date being prior to the application for the second Kulka patent. I find no patentable novelty in the construction of the second Kulka socket over the prior Kurtzon disclosure. The slidable or yieldable feature of the socket is its most conspicuous char-

acteristic. All this is shown by Kurtzon. Nor is there any material difference between Kurtzon and the subject matter of claim 6 of Kulka other than the slightly different device for keeping the sliding sleeve and casing from coming apart. They operate in substantially the same way and perform the same function. Both permit the slidable part to move telescopically with respect to the fixed base. There seems to be no merit or ingenuity in the substitution of the old split ring device of Kulka for the slotted guide member of Kurtzon. The fact that the base and the slidable portion of the two sockets are reversed would seem to make no patentable distinction.

The Blackmore patent, No. 1,363,-558, and Nelson patent No. 2,491,128, show that the split ring device referred to in claim 6 of the Kulka patent is an old expedient in the art of preventing a separation of telescopic members. In my opinion the second Kulka patent (196) is invalid because anticipated by the prior art and also is not infringed by the defendant's device.

Counsel are requested to present the appropriate order in due course.