**KAY PATENTS CORP. v. MARTIN SUPPLY CO., Inc. et al.**

No. 6531.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1953.

Decided Feb. 19, 1953.

Asher Blum, New York City (Mock & Blum, New York City, on the brief), for appellant.

Theodore S. Kenyon, New York City (Kenyon & Kenyon and Edward A. Ruestow, New York City, on the brief), for appellees.

48

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a civil action for patent infringement with the standard defenses of invalidity of the patents and non-infringement. The patents in suit, originally granted to Eugene Kulka, were assigned to plaintiff on October 27, 1950. The claims in issue are as follows:

| Number | Filing Date | Issue Date | Claims in Issue |
|---|---|---|---|
| 2,464,643 | April 5, 1945 | March 15, 1949 | 1-5, inclusive |
| 2,495,196 | December 18, 1948 | January 17, 1950 | 6 |

The District Court held that both patents were invalid for lack of invention and that neither patent was infringed by the accused devices. Plaintiff has appealed to us from the judgment below dismissing this patent suit. The elaborate opinion of the District Court, with extended findings of fact and conclusions of law, is found in 105 F.Supp. 442.

The patents in suit relate to sockets for supporting and electrically connecting fluorescent lamps. The lamps are composed of a cylindrical envelope of glass with insulated heads. From these heads, at each end, protrude metal prongs or pins that serve to make electrical connection with the metal contacts within the socket, when the lamp is completely put in place. At each end of, and within, the glass envelope, is positioned an electrode, which, when sufficiently heated, permits the spark or electric current to jump from one end of the glass envelope to the other end. The illumination thereby produced is aided and intensified by a gas and a coating of powder within the lamp. These fluorescent lamps have been in use for about fifteen years.

In what might be called the "early type" of these lamps, the glass envelope was of relatively small diameter and did not exceed a yard in length. And there were, at each end of the lamp and on the outside, two pins or prongs fitting into openings in the sockets. Electric power was furnished by the ordinary house current, usually around 110 to 120 volts. This resulted in a flicker and a slight time interval lapse, after the current was turned on, before the lamp became completely lighted.

To overcome this flicker and delay, a "new type" of instant starting lamp was devised. The glass envelope of this type was larger and longer than the envelope of the early type. For this instant starting lamp, a higher voltage was required, so it was necessary, in order to step up the voltage to around 800 volts, to place a transformer in the electric circuit to which the lamp was connected. A single pin or prong at each end of the glass envelope replaced the double pins of the early type.

It immediately became apparent that the new type of fluorescent lamp, which seems to have been first developed by the General Electric Company in 1944, required a socket different from the socket in the early type. Accordingly, during the months of July, August and September, 1944, the various makers of fluorescent lamps (including the Kulka Company, Sylvania, General Electric and the Bryant Company) occupied themselves with designing and developing the needed new sockets. During World War II, the limited supply of materials prevented any output of the new type lamps on a large, commercial scale; but, in 1947 and thereafter, when larger supplies of materials became available, production of the new type of lamps greatly increased.

This brings us to a consideration of the first Kulka patent, 2,464,643, applied for April 5, 1945, granted March 15, 1949, which is entitled "Holder for Gaseous Discharge Lamps."

Claim 1, the vital claim in the patent, reads:

"1. In gaseous discharge lamp service assemblages, wherein the lamp presents its external contacts at the ends of the lamp with the contacts axially alined, wherein the lamp is supported within secondary and primary holder casings with the holders (1239) positioned respectively within the external contact zones of the lamp, and wherein the lamp is rendered ac-

tive by controlled alternating current supply actively applied thereto through said holders with the supply including an auto-transformer assembly operatively connected with the holders to provide the primary and secondary circuits utilized in rendering the assemblage active, an assemblage of such type characterized in that the secondary and primary holder casings are of insulating material and are secured in definitely spaced relation and each operatively related to the auto-transformer circuits to apply the secondary and primary circuit values to a positioned lamp through the respective holders, *each holder including an inlet opening for receiving a lamp external contact end zone with the inlet openings facing each other,* each holder also having an internal supporting member of insulating material for a lamp external contact with the members located relative to the inlet openings, the supporting member for the holder being fixedly positioned, the supporting member for the secondary holder being *movable yieldably* away from its inlet opening and carrying a contact member carried by and movable with the supporting member, said contact member being spaced from the holder inlet opening by its supporting member, said movable supporting member being supported by a *biasing spring* operatively connected to the secondary circuit and to said contact member to form an element of the secondary circuit, said primary holder having a pair of individual permanently-spaced contact springs positioned for operative contact with an external contact of the positioned lamp and mounted for primary circuit activity in presence of such positioned lamp with one of said contact springs active within both primary and secondary circuits." (Italics supplied.)

In the specifications, it is stated:

"The invention relates particularly to holder-socket means for a gaseous discharge lamp which is operated at high voltage, such as 600 volts—1,000 volts or more. The accidental touching of such a high-voltage contact results in serious injury or death.

"A lamp of this type has a single external metal contact head or prong, at each end thereof. Such lamps do not require starters. *I provide a primary holder-socket and a secondary holder-socket for each lamp.* The high and dangerous voltage is applied to the terminal of the secondary holder-socket. This high voltage is secured, for example, from the secondary section of a step-up auto-transformer. This high voltage secondary circuit remains open, until a lamp is inserted into the two holder-sockets, whereby the secondary circuit is closed through the lamp itself. When the lamp is inserted, it covers and obstructs the high-voltage contact, thus preventing accidents.

*   *   *   *   *   *

"In order to connect the lamp to the secondary current circuit, it is necessary first to insert the contact head 3a into the secondary holder 17 through its open insert end and push the bushing 18 inwardly against the biasing force of spring 19. This is done by the pressure of head 3a against the respective wall or portion of metal cup 20 which crosses the bore of the bushing 18. The bushing 18 must be pushed inwardly of the position shown in Fig. 1, in order that the lamp 1 can be horizontally located, with its head 3 located exernally to the primary holder 7. The head 3 is then inserted into the primary holder 7, through its open insert end, so that said head 3 projects through the bore of the fixed insulating partition or washer 21, which then abuts head 2, to act as a stop. The free ends of the contact springs 9 and 9a then enter the Grove G of head 3, thus making good contact." (Italics supplied.)

It should be noted that the patent is in no sense revolutionary but is one in a rather crowded field. It is narrow in

scope, limited to the sockets or holders, and does not pretend to cover either the electric circuit or the lamp. It can be sustained as a structure patent only on the ground that it is a combination patent, producing new and useful results. In the celebrated case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 152–153, 71 S. Ct. 127, 130, 95 L.Ed. 162, Mr. Justice Jackson stated:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

See, also, Lincoln Engineering Co. v. Stewart-Warner Corporation, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334. We think the District Judge correctly held the patent invalid for lack of invention.

What plaintiff's counsel evidently regard as a distinctive and important element of this patent was the construction of the sockets in a way which made it impossible to fasten the lamp into both sockets unless *one end of the lamp was first inserted into the secondary socket*. Kulka's idea here was a safety feature for avoiding injury by dangerous contact, particularly if the insulation proved defective, with the high voltage current. This feature resulted from the fact that the flow of electricity in the circuit is started only when the contact head of the lamp is connected with the wiring in the primary socket. It is worthy of note that

this "safety feature" is found neither in the present commercial device of Kulka nor in the second Kulka patent, No. 2,495,196. The patent was limited to a structure in which each socket had an opening large enough to receive, not just the pin or prong, but the entire end zone of the lamp.

We agree with the District Judge that this feature of the patent discloses no novelty rising to the dignity of invention but only the skill of those versed in the art. This becomes apparent from the prior art, particularly the Sparling, Russell and Ranney patents. Thus, in both Russell, No. 2,295,757, and in Ranney, No. 2,395,145, we find the same electrical circuit disclosed by Kulka. In Ranney, it is shown that the two-pin lamp can be effectively made a single-pin lamp by interconnecting the two pins with a metal strip. Sparling, No. 2,285,175, discloses sockets with openings large enough to receive the entire end zone of the lamp and makes it clear that the supporting members in one socket may be fixed, provided those in the other socket are movable and yieldable. We find then in this patent in suit only a non-patentable aggregation, with unimportant changes, of some of the elements disclosed by Ranney, Russell and Sparling.

It is not without importance that, as the District Judge found [105 F.Supp. 449]:

"When in 1948 and later the new type of lamps became available in large quantities the several companies, Kulka, Sylvania, Bryant and General Electric, had developed and were ready to produce the new types of sockets which were substantially similar. The several companies were acting independently of Kulka and presumably of each other. * * * These facts lead logically to the view that where the independent contemporaneous work of several persons has had similar results, it is strongly persuasive that what has resulted is not due to invention but to the mechanical skill of competent workmen in the same field."

Very apt and quite in point, too, are the District Judge's quotations, as to the weight of such evidence against patentability, from the opinions of Mr. Justice (afterwards Chief Justice) Stone, in Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222, and our own Judge Soper in McElrath v. Industrial Rayon Corporation, 4 Cir., 123 F.2d 627.

We must agree, too, with the District Judge's finding:

"10. The defendants' accused sockets do not include the characteristic structure of the '643 patent. They have no outer casings or enclosures with large openings adapted to receive the large end of the lamp. In defendants' structure there is no compulsory order of steps in inserting the lamp in operative position."

■ The law is well settled that when the accused structure omits an essential element of a patent, without the substitution of an equivalent, operating substantially in the same way to achieve practically the same result, there is no infringement.

Said Judge Parker, speaking for our Court, in Montgomery, Ward & Co. **v.** Rogers, 4 Cir., 100 F.2d 721, 722:

"It is well settled that there is no infringement where an element of a combination thus made material in the claim is not embodied in the alleged infringing device."

To like effect are the words of Judge Soper, also speaking for our Court, in Bailey v. Galion Iron Works & Manufacturing Co., 4 Cir., 80 F.2d 805, 807:

"The omission of this element is sufficient, in our opinion, to avoid the charge of infringement, for it is well established that the omission of an element of a claim of a patent without substituting an equivalent therefor avoids infringement of the claim."

See, also, Lektophone Corporation **v.** Rola Co., 282 U.S. 168, 51 S.Ct. 93, 75 L.Ed. 274; Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 4 Cir., 139 F. 312, 323.

■ We have less difficulty in upholding the findings and conclusions of the District Judge that the second patent in suit, Kulka No. 2,495,196, is invalid for lack of invention over the prior art, and that it is not infringed by the accused device.

We need consider only Claim 6 of the patent, which reads:

"6. For use in holding one end of a lamp which has respective external and parallel and longitudinally-alined and conductive contact heads, a casing made of insulating material and comprising a base, a hollow member which is telescopically slidable over said base, and an internal conductive spring which biases said hollow member away from said base, said hollow member having at least one longitudinal inlet-opening, and a contact member which is fixed over said inlet opening in a position to contact with a respective inserted contact head of the lamp, said base having a conductive terminal, said spring touching the conductive terminal at one end and the contact member at the other end, *said base* having an externally projecting peripheral flange, said hollow member *having an internal peripheral resilient ring,* said ring being positioned to abut said flange when said hollow member is biased away from said base and *to prevent said hollow member from leaving said base."* (Italics supplied.)

This patent dispenses with what was claimed as a distinctive feature of the first Kulka patent—the compulsory order of inserting the ends of the lamp into the sockets. And this second patent provided (instead of the insertion of the whole end zone of the lamp) for the insertion of only the contact pin or prong into the secondary socket. In this way, a pair of sockets of uniform size would be suitable for lamps of varying sizes. There is nothing whatever novel in the primary socket.

Included in the secondary socket is a fixed hollow base with a movable cup-like sleeve. In the end of this sleeve is a small opening, which faces the primary socket in order to receive and support the prong or pin of the lamp. The patent discloses a spring inside the sleeve and base for the purpose of separating these members. This spring also serves to carry the electric current to the inserted lamp prong or pin from the high voltage end of the transformer. Within the sleeve, cooperating with an annular flange extending outwardly on the fixed base, is a split-ring device which serves to prevent the sleeve and base from coming apart.

We think this patent is clearly invalid for lack of invention over the prior art. In every substantial respect, it is quite similar to the disclosures of the Kurtzon patent, No. 2,560,877. Almost the only difference, which is quite inconsequential, between the two patents is that Kurtzon uses a slot and pin device instead of Kulka's split-ring, mentioned above. It is clear that the split-ring is an old expedient in the art for preventing the separation of telescoping members. It is clearly shown in the Blackmore patent, No. 1,363,558, and the Nelson patent, No. 2,491,128.

Differences in the construction of the accused sockets and those disclosed in the patent in suit indicate a lack of infringement. There is no telescoping of the accused secondary socket over the base, the telescoping takes place within the base. In the accused secondary socket, neither the base nor the spring has a conductive terminal within the socket. And in this socket, the split-ring device is positioned outside of the slidable member.

For the reasons stated, we must agree with the findings and conclusions of the District Judge that both the patents in suit are invalid for lack of patentable invention over the prior art and that neither of these patents is infringed by the accused devices. The judgment of the District Court must, therefore, be affirmed.

° Affirmed.