TRICO PRODUCTS CORPORATION,
Plaintiff,

v.

DELMAN COMPANY, a Partnership,
et al., Defendants (two cases).
Civ. A. Nos. 3–648, 3–731.

United States District Court
S. D. Iowa,
Central Division.

Sept. 27, 1961.

signee of Erwin C. Horton, and charges infringement by defendants of claims 5 and 6. In the second count plaintiff alleges ownership of United States Patent Number 2,717,556 issued to it September 13, 1955 as assignee of George O. Bartoo. Only claims 1, 2 and 4 are involved in this litigation.

The second case alleges that plaintiff is the owner of United States Patent Number 2,743,473 issued to it on May 1, 1956 as assignee of John L. Oishei. The claims involved are claims 4, 5, 12, 25 and 35, and claims 3, 22 and 32.

Plaintiff charges direct infringement of the Bartoo patent but as to the Horton and Oishei patents in suit charges defendants only with contributory infringement.

Defendants' defenses will be discussed as each patent is taken up separately. Defendants by counterclaim rely upon two patents. They rely first upon Neufeld reissue Number Re 24,507, the original patent Number 2,702,918 having been dated March 1, 1955 and the reissue dated July 22, 1958. The application for the original patent was filed June 7, 1951. Defendants also charge infringement of United States Patent Number 2,703,127 issued March 1, 1955 to Edmond F. Webb and assigned to the Delman Company. The application was dated October 17, 1952.

Edward A. Haight, Chicago, Ill., Edwin T. Bean, Buffalo, N. Y., Frank G. Raichle, Buffalo, N. Y., M. Talbert Dick, Talbert Dick & Zarley, Des Moines, Iowa, for plaintiff.

Rudolph L. Lowell, Lowell & Henderson, Des Moines, Iowa, Charles F. Meroni, Chicago, Ill., for defendants.

VAN PELT, District Judge.

By agreement of the parties the two cases above described have been consolidated for trial. Both are so-called patent cases involving windshield clearing systems. The first case filed involved two patents; the first count concerns United States Patent Number 2,206,814 issued to plaintiff on July 2, 1940 as as-

Plaintiff's count for unfair competition contained in the first case filed, has, pursuant to stipulation of the parties, been dismissed with prejudice. Similarly, the charges made by defendants alleging unfair competition and violation of the antitrust laws have by stipulation been dismissed with prejudice.

Trico and Delman had previous litigation involving certain claims of the Horton patent and involving United States Patent Number 1,949,098 issued to Albert W. Becker. The decision of the Court of Appeals in this litigation, reported in 180 F.2d 529, affirmed the judgment of Judge Dewey reported in 85 F.Supp. 393. At the opening of that trial it was stated to Judge Dewey by

counsel for Trico that as to the Horton patent it would rely upon claims 9, 13 and 14. There is therefore before the court the question raised by defendant as to whether this litigation, so far as the Horton patent is concerned, is barred by the previous case. Plaintiff contends that the claims involved herein were not involved in the previous litigation, the record of which has been introduced in evidence (See Defendants' Exhibits 2 and 2A). In that litigation Judge Dewey held that the claims in suit on the Horton patent were void for want of invention. He originally held the entire patent void for want of invention and thereafter amended his findings to limit it to claims 9, 13 and 14. The effect of this litigation will be considered hereafter when the Horton patent is discussed.

It is clear that this court has jurisdiction by reason of the patent laws of the United States. Validity and infringement only are before the court at this time. It was the suggestion of the court, approved by counsel, that no evidence be introduced on the issue of damages until a decision on the other two issues had been reached.

: In this opinion the court takes up as to each patent, first the issue of validity. It then turns to infringement as to the patent under consideration, believing, in event of an appeal, that it is best for the Court of Appeals to have before it findings on all issues, in event the court's reasoning as to validity is not followed.

Bartoo Patent Number 2,717,556, Plaintiff's Exhibit BB–1

George O. Bartoo, who assigned the Bartoo patent to plaintiff, is an engineer in plaintiff's experimental department. In the Spring of 1952 he was asked to develop a foot-operated washer which would not have the faults or defects present in the popular model at that time (S.T. 589–90). An application was filed with the patent office on October 16, 1952 and the above numbered patent issued September 13, 1955. Claims 1, 2 and 4 only are involved herein.

As has been earlier indicated, direct infringement is charged as to this patent.

In determining whether or not the Bartoo patent is valid, attention needs to be given to the prior art. As will be hereafter evident when Oishei is discussed, it is clear that the Oishei patent (Plaintiff's Exhibit BB–2), although not issued until May 1, 1956, was applied for July 3, 1952. The application thus antedates the Bartoo application by approximately 3½ months.

Because of a stipulation or statement that Bartoo would be limited to the filing date (See S.T. 713–14) and the presumption that the filing of the application constitutes anticipation and reduction to practice of the subject matter of the patent issued thereon, it is contended that the Oishei patent, in disclosing a pump unit, anticipates that of Bartoo and that plaintiff has failed to prove beyond reasonable doubt that Bartoo had reduced to practice his rubber bulb foot-pump prior to the Oishei patent filing date. The evidence shows that Oishei had seen the Bartoo device; that he never considered the specific bulb structure to be his invention; that he merely took it from Bartoo and used it as one component in his invention (S.T. 1494–95; 1536–7). It also appears from the record that on the next day after the statement was made as to the filing dates above mentioned, counsel for plaintiff (S.T. 713–4) called attention to this statement and stipulation and stated that it was not intended to mean that Oishei was prior art as against Bartoo and took the position that Bartoo came ahead of Oishei.

The court concludes from the evidence that Oishei was not prior art as to Bartoo and recognizes that as to the bulb structure as between Bartoo and Oishei it was Bartoo's invention and not Oishei's.

It is also clear from the evidence that Bartoo had seen the foot washer of the competitor, to-wit, Delman; he knew that the Ford Company was then using the Delman foot washer. In his develop-

ment he immediately started out with the rubber bulb and explains his use of it on the basis of "the minimum pieces" stating that you could combine the rubber bulb, the plunger and the cylinder and means for containing the fluid into "as few possible pieces as possible" by molding them integrally into one unit and providing a mounting base for it. He admits by using this method that he did not develop any new principle of pumping water or fluid (S.T. 589–95).

The claims in suit read as follows:

"1. A windshield washer pump unit comprising a one-piece construction in the form of a bulb molded of elastic material and having a bottom wall with an upstanding substantially cylindrical wall forming a chamber, a substantially cylindrical plunger-forming top wall of lesser diameter than the chamber for fluid-displacement reception thereby, and a medial pressure-distensible flexible wall joining the top rim of the chamber to the plunger and yieldably supporting the latter for being depressed into the chamber for displacing fluid therefrom, and inflow and outflow passage means communicating with the chamber, said chamber having its upstanding side wall reinforced to confine the pressure-responsive distention of the wall area of the bulb to said pressure-distensible medial wall section."

"2. A windshield washer pump unit comprising a one-piece construction in the form of a bulb molded of elastic material and having a bottom wall with a marginal wall upstanding thereabout to form a chamber of cup shape, a self-sustaining plunger-forming top wall opposing the bottom wall and being less in diameter than the chamber for fluid-displacement reception therein, and a medial flexible wall joining the brim of the cupped chamber to the lower end portion of the plunger and yieldably supporting the latter normally elevated above the brim, said plunger and the adjoining por-

tion of the medial wall being jointly depressible into the chamber to augment the effective displacement area of the unit, and inflow and outflow passage means communicating with the chamber, said upstanding wall being reinforced up to said brim to resist its lateral distention."

"4. A windshield washer pump unit comprising an elastic bulb having a cupped base section forming a chamber, a top section of lesser diameter than the chamber for being received therein, and a medial wall section joining the top section to the upper portion of the cupped base section and flexible upon the depression of the top section into the chamber, said cupped base section having its side wall reinforced up to the medial wall section, and a headed mounting member having an anchoring shank extending through a hole in the bottom wall of the cupped base section with the head of the mounting member arranged within the chamber and overlying the bottom wall to clamp it to a support, said mounting member including a cooperating clamp device engaged with the shank, and inflow and outflow passage means communicating with the chamber."

The main elements called for in Claims 1, 2 and 4 are a cylindrical plunger-forming top wall, a bottom wall with an upstanding substantially cylindrical wall forming a chamber, a medial wall which is relatively more pressure-distensible than the lower portion, and a lower chamber having its upstanding side wall reinforced.

Exhibits 69 and 70, Delman lever and bulb devices, were in existence prior to the time Bartoo conceived his idea. In many respects Bartoo's idea is the same, but the court does not believe that all of the elements of Bartoo are to be found in Exhibits 69 and 70. Exhibit 153, being Chart 9, sets forth defendants' contentions with reference to these exhibits. While there is much to be said for the claim that the flange encased in

metal operates as an upstanding side wall reinforced to take the place of 16 in figure 2 of Bartoo, the court believes that it is the metal clamping of the bottom wall and folding it over onto the rubber flange that permits the distension of the rubber bulb rather than the thickened portion of the flange itself, and while Exhibits 69 and 70 are important in showing certain elements of the prior art, they do not in themselves defeat Bartoo.

Of greater importance, so far as prior art is concerned, is the Brown patent Number 2,702,147 and being patent 27 in Exhibit 136. Brown's application was filed March 10, 1951 and his patent issued February 15, 1955. He has a rubber or flexible material pumping element 15, both with a thickened bottom wall 23, and also an outside surrounding wall 16, of the same material. It is not metal but its purpose is the same as in Delman, a matter which we will discuss hereafter. It is to be observed also in figure 3 of Brown that when the plunger is pushed down some outward distension in the wall 15, appears. The importance of this is to be found on pages 20 to 23 of plaintiff's brief in discussing the infringement of Bartoo. The court believes that Brown was prior art so far as Bartoo is concerned both as to the thickened bottom wall and as to the pressure distensible or medial flexible wall. It seems to the court that Brown lacks only the one-piece construction claimed in Claims 1 and 2. Claim 4 is broader and encompasses, as the court believes, the separate reinforcement of the upstanding side wall.

Similarly the DeKiss application (patent 22 in Exhibit 136), filed July 22, 1943, has thickened walls (see No. 34, figure 1) and a portion 30, that can be expanded or collapsed, resulting in a flexing of one-half of the bladder while the other half should remain stationary. It thus seems to the court, without reference to Exhibits 125 and 126, the "football type" pumps, that the prior art was in such a state that Bartoo, taking the Delman device and with the knowledge of Brown and other devices, added nothing in the form of inventive genius in devising the bulb which is the basic part of his patent. Bartoo did not exceed "what reasonably could be expected of a skilled mechanic * * * in view of what was common knowledge and what was disclosed by the prior art," which is the test of invention set forth in Caldwell v. Kirk Mfg. Co., 8 Cir., 1959, 269 F.2d 506, 510. Claims 1, 2 and 4 of the Bartoo patent are invalid.

If the court is correct in its observation, it is unnecessary to pass on the infringement. As heretofore stated, however, the court will, as to each patent, pass on infringement.

It is clear from the testimony that defendant company's sales manager and principal officer obtained a sample of the Bartoo pump and lever device and sent it to one of the Delman partners at an early date. It also appears that a Delman partner hired two regular employees of Ford to take the Trico device, make a print of it, and with few variations, put Delman's name on it and submitted it to Ford as a Delman product.

These matters are mentioned because it is clear that Delman had a Trico device at the time the Delman device was conceived. It is clear to the court that Delman attempted to infringe the Trico device and as to Claim 4 of Bartoo, if patentable, did infringe.

The chief difference in the two devices is in the construction of the lower part of the outer wall and the use by Delman of a metal cup to contain the device and to act as a retaining wall when pressure was applied to the device. Because, however, Claims 1 and 2 of Bartoo are limited to a one-piece construction and Delman is not of one-piece construction, the court is not holding that Claims 1 and 2 have been infringed. Claim 4 is broad enough to include a separate reinforcing up to the medial wall section. Delman definitely infringes this claim. The court therefore finds that Claim 4 of Bartoo has been infringed by Delman.

Oishei Patent Number 2,743,473,
Plaintiff's Exhibit BB–2

Before discussing the validity over the prior art, or infringement of the Oishei patent the court will consider a variety of defenses which defendants have raised in connection with it.

Defendants have stated the following proposition:

"Plaintiff's Charge of Contributory Infringement of the Horton and Oishei Patents Fails Because There Was an Implied License to Plaintiff's Wiper Customers to Use Same With Washers; And There Was No Direct Infringement Established In Defendants' Sale of Washers To Such Customers."

The discussion which follows is likewise applicable to the Horton patent.

Each of the claims of the Horton and Oishei patents describes a complete windshield clearing system. Defendants do not manufacture complete windshield clearing systems. Insofar as the defendants are charged with infringing these patents plaintiff is charging contributory infringement only. There is no dispute upon this point.

A fundamental question presents itself at the outset: Was there direct infringement of the patents? Unless this question can be answered in the affirmative defendants cannot be guilty of contributory infringement. This proposition was recently restated by the Supreme Court in Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592. Reference was there made to the "fundamental precept that there can be no contributory infringement in the absence of direct infringement." 365 U.S. at page 341, 81 S. Ct. at page 602. The answer to the question of direct infringement rests, in turn, upon the answer to another question: Did the sale by the plaintiff of its wiper motors, constructed for coordination of washer and wiper, impliedly license the purchaser to use the patented washer-wiper combination? If so, then the result

will be that stated by plaintiff in its reply brief at page 18:

"If sale by plaintiff of its wiper motors to the car companies had carried with it an implied license to use the patented washer-wiper combination, sale by defendants of washer components designed specifically for use in that combination could not have constituted contributory infringement, because obviously one cannot contribute to infringement if there is no infringement to which to contribute."

Plaintiff has sold to various car manufacturers wiper motors, Exhibit 140 being a typical example, so constructed that they can be used to achieve conjoint use of washer and wiper in addition to independent operation of the wiper. Defendants' position is that by sale of this specially constructed wiper motor plaintiff gave an implied license to the customer to use the article in the manner intended; i. e. the customer could use a Delman washer in conjunction with this wiper motor.

Plaintiff does not agree that the purchasers of the wiper motor were impliedly licensed to procure the washer and coupler components of the combination from others. Plaintiff says at page 8 of its reply brief:

"But the law is perfectly clear that if an article has an established and recognized use by itself and without being made a part of the combination, the mere fact that it is also suitable for use in the patented combination does not result in an implied license to make or use that combination."

There is no dispute that the wiper motors sold to car manufacturers, and specially constructed for use with both washer and wiper motor controls, are capable of independent use to operate only a wiper. According to plaintiff, the motors were so constructed to enable plaintiff to take advantage of washer sales in the jobber market and because Trico was selling the same motor to

other customers for use with its co-ordinated washers. Plaintiff admits in Request for Admission 54 that by such sales it licenses the manufacturers and their customers to use the product sold. But the court does not agree with the position advanced by the defendants that by such admission plaintiff has also admitted it licensed the use of the wiper motors in conjunction with the entire combination.

■ This conclusion seems correct when viewed against the law. The sale of an element of a patented combination does not imply the right to use the combination. Radio Corp. of America v. Andrea, 2 Cir., 1937, 90 F.2d 612; Westinghouse Elec. & Mfg. Co. v. Independent W. Tel. Co., D.C.S.D.N.Y.1924, 300 F. 748; General Electric Co. v. Continental Lamp Works, 2 Cir., 1922, 280 F. 846; See Hunt v. Armour & Co., 7 Cir., 1950, 185 F.2d 722. Since the wiper motor was capable of use other than in the patented combination the court holds that no license is to be implied in favor of the purchasers of the motor to use the washer-wiper combination without procuring the washers from Trico. It follows then, for purposes of this case, that purchasers of plaintiff's wiper motors were guilty of direct infringement when they constructed the combination patent by installing a component thereof without being licensed by plaintiff-patentee to do so.

Defendants set up as a defense to contributory infringement a misuse of the patent by plaintiffs. Relying on Mercoid Corp. v. Mid-Continent, 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, the defendants seek to establish that:

"Here as far as the Horton and Oishei patents are concerned, they have *no claims on the washer structure per se,* being sold by the Defendants. As far as those patents are concerned, Defendants' washers are unpatented parts, and the Plaintiff is not entitled to extend the monopoly of its patents so as to cover such unpatented parts, especially,

in view of its implied license to the purchaser of its specially constructed or double post wiper motors." Defendants' Brief, p. 22.

In the Mercoid case cited above the Court stated 320 U.S. at page 667, 64 S.Ct. at page 272:

"The patent is for a combination only. Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly."

The Aro case, supra, has recently reaffirmed this. Mr. Justice Whittaker stated 365 U.S. at page 345, 81 S.Ct. at page 604, 5 L.Ed.2d 592:

"No element, not itself separately patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination * * *."

This doctrine, even though thoroughly established, is not without qualification. In his concurring opinion in the Aro case Mr. Justice Black had this to say 365 U.S. at page 361, 81 S.Ct. at page 612:

"[T]he public has the right to make, use and vend each part [of a combination patent] subject only to the established limitation of contributory infringement: that a part may not be knowingly supplied for use by an unauthorized person in a new making of what is in effect the whole combination."

It is true that in the Aro case the issue was the "reconstruction" of a combination patent, but the principle is the same as far as the idea of contributory infringement is concerned. 35 U.S.C.A. § 271(c) governs contributory infringement. It provides as follows:

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be

especially * * * adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

██ The principle that emerges is this: a patentee of a combination patent is not entitled to protection as to unpatented parts of the combination, but if such unpatented parts are produced and used in such a way as to constitute contributory infringement within the meaning of 35 U.S.C.A. § 271(c) then the patentee is entitled to redress from the person supplying the unpatented component part unless patentee is guilty of patent misuse such as found in Mercoid. Applying this principle to the facts of the case at bar the court concludes: even though Trico cannot claim protection against Delman's manufacture and sale of the foot washers on the theory that its Oishei and Horton patents afford protection against direct infringement, it can claim protection and redress for such manufacture and sale by Delman when they amount to contributory infringement. Further support for this result is found in the provisions of 35 U.S.C.A. § 271(d):

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having * * * (3) sought to enforce his patent rights against infringement or contributory infringement."

Trico by bringing this suit and claiming in connection therewith that Delman has no right to sell its washers to be used in the combination patent is not to be deemed guilty of misuse or illegal extension of its patent. Delman's defense upon this ground is inadequate.

██ The result on this aspect of the case is this: since Trico's customers were not impliedly licensed to use the specially constructed wiper motors they had purchased from Trico to construct the entire combination patent by adding the Delman foot washer, such action by Trico customers constituted direct infringement of the combination patent. Having found direct infringement it may be that Delman is guilty of contributory infringement, but the court does not pass upon that question at this point in its opinion. It is further held that the principle that the patentee of a combination patent is not entitled to protection of unpatented parts of such combination patent does not prevent relief for contributory infringement.

It is the contention of defendants that because of laches plaintiff is estopped to assert Claims 3, 22 and 32 of the Oishei patent against defendants' 1958 Thunderbird washer.

It is to be observed in this connection that this case was set for trial before the Honorable Edwin R. Hicklin at Davenport and the trial began on May 18, 1959. Opening statements were made by plaintiff and at that time plaintiff asked leave, and the court permitted it, to amend its complaint to charge defendants' non-foot type Thunderbird washer with infringement of Claims 3, 22 and 32 of Oishei. Upon defendants' claim of surprise, the trial was continued. By reason of Judge Hicklin's illness the case was not tried until July, 1960. Plaintiff acknowledges that it had knowledge of defendants' 1958 Thunderbird washer in about October, 1957. Plaintiff's expert had prepared charts to offer at the May, 1959 trial (See Exhibit 134, pages 36–38) and admitted in his deposition, Exhibit 134, that he had examined a Thunderbird washer in the middle of 1958. These are, in substance, the facts upon which defendants rely in their plea of estoppel.

██ While there are many cases dealing with the subject of estoppel, most of them indicate, so far as the defense of laches is concerned, that if the suit is brought within the statutory period then the burden is upon the de-

fendant to show that extraordinary circumstances justify application of the laches doctrine. See Craftint Mfg. Co. v. Baker, 9 Cir., 1938, 94 F.2d 369.

■ This is a defense which can be waived and the burden is on the defendant asserting laches to show that the delay resulted in injury to defendant. The court does not feel that the evidence so shows. The Delman Company was not made a party defendant until March, 1959 by stipulation of the parties. When defendants objected to the amendment asserting these three claims of Oishei against the Thunderbird washer, Judge Hicklin overruled the objections and gave additional time to the defendants to meet the claim. In examining the cases in which the defense has been asserted it would appear that while diligence must be observed to escape the charge of laches, unless the period of inactivity runs beyond the analogous statutory period that the burden of proof is upon the one asserting the doctrine, in this case the defendants, to show circumstances justifying application of the doctrine. That burden has not been met in this case. The court concludes that it must examine the asserted claims to see if they are infringed by defendants' 1958 Thunderbird washer.

It is next contended by defendants that the Oishei patent is invalid because it fails to meet the requirements of 35 U.S.C.A. § 112 by failing to distinctly point out and claim the subject matter of the invention. The court has examined the patent in the light of the objection. In view of the record in this case the court rejects the argument. Plaintiff has produced many charts and the testimony of its expert pointing out in detail wherein defendants' device infringes plaintiff's device. In turn defendants' expert by charts and by oral testimony makes special reference to the points of infringement and anticipation. Likewise, defendants' expert is able to take the Mandy device, hereafter discussed, and from it make the claim that it antedates Oishei. Even if counsel cannot do so the experts seem to have no difficulty in pointing out the subject matter of the invention. The court concludes that Oishei is not invalid under this argument.

Another objection to be dealt with is defendants' claim that amendment of the Oishei specification to make reference to a copending application constituted "new matter" so as to invalidate the Oishei patent. The factual background of this dispute is as follows: The original patent application was made on July 3, 1952. The application pointed out that Figs. 21 through 23 showed a further embodiment similar to that of Figs. 1 through 4. It stated of Fig. 19 that "the washer unit is similar to that shown in Fig. 1 except that the suction valve is electrically opened instead of manually." 35 U.S.C.A. § 112 requires that an application must be sufficiently clear and exact "to enable any person skilled in the art * * * to make and use" the invention. The patent application was amended as follows: "This electrically controlled washer unit is more fully disclosed in copending application Serial No. 323,902." Defendants cite Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 and patent office regulations for the proposition that the application for a patent cannot be broadened by amendment to embrace an invention not described in the application as filed. The determinative issue then is whether the patent as originally filed provided a sufficient disclosure so that one skilled in the art could have fashioned a suction valve to open electrically. Testimony by both Fishleigh and Macklin indicates that this was a sufficient disclosure (S.T. 1623–24, 1366). The court holds that the statutory requirement as to a sufficient disclosure was met and that the amendment did not inject "new matter" into the application. There is lacking sufficient proof for the court to find that the Oishei patent was fraudulently procured as defendants urge.

■ Defendants also set up that the Oishei patent is devoid of invention be-

cause it was anticipated by the so-called Mandy device, which defendants claim was reduced to practice in 1949. Briefly, it is claimed that one Robert R. Mandy and Joseph E. Muccioli invented the device in 1949 when both were employed by Kaiser-Frazer, and that the device was installed on Mandy's car and was successfully operated over a period of several months. In examining the facts relating to this device, it is almost elementary to state that the burden of proof is on defendants and that "the proof shall be clear, satisfactory and beyond a reasonable doubt." See The Barbed Wire Patent, Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154. Some of the language of this case may have application here.

"In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defence of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer." 143 U.S. at pages 284, 285, 12 S.Ct. at page 447.

The facts surrounding this alleged invention were brought out during the taking of a deposition of Mandy and Muccioli, and two others, Willis Kibler and Walter H. Geisler, who allegedly made the model and witnessed a drawing respectively.

All four had been Kaiser-Frazer employees. Muccioli and Geisler, when their depositions were taken, were in the employ of principal purchasers of defendants' products, to-wit, Ford and Chrysler, respectively. Kibler and Mandy were employed by a company close to if not controlled by defendant company and its vice president Mr. Bachrach. Mr. Kibler started employment since this case was filed.

The court cannot refrain from commenting that on this important issue the four who had the most knowledge of the device were never called before the court in person although great expense has been incurred in conducting the trial. The employment of Mandy and Kibler was such that defendants could have arranged for their presence at the trial. The depositions taken by plaintiff's counsel were relied upon for their testimony. The court thus has no opportunity to observe these witnesses. This would have been of great aid in evaluating their credibility.

After a careful study of the depositions relating to the Mandy device the court concludes that there is not sufficient evidence of a reduction to practice for a holding that this device anticipated Oishei. Only one such device is claimed to have been operative. That device was not produced as evidence nor was its absence ever satisfactorily explained.

It is reasonably clear that it came into the possession of Mr. Bachrach in 1949, who deemed it important that he take possession of it. Yet it was apparently not of sufficient importance, though it could be controlling in this case, that he retain it where he could find it. Many other early models of other structures have been produced by each of the parties. The evidence has failed to convince the court that there ever was such a device as Mandy's, and even if there was the court has not been persuaded that it was operative. The court holds that the Mandy device did not anticipate any of the claims of Oishei.

Defendants urge the court to find the Oishei patent invalid on the ground that it is inoperative. Specifically, it is urged that the mechanism disclosed in figs. 21–23 is inoperative and that this is established by the testimony of defendants' expert. The court is not disposed to view this argument with favor, especially in view of the fact that plaintiff introduced into evidence a structure (EE–102) embodying figs. 21–23 which is operative. Defendants have attempted to negate the probative value of this structure. But a viewing of the apparatus by the court and a study of the testimony concerning it leads the court to hold that the mechanism of figs. 21–23 is operative. Therefore the patent cannot be ruled invalid on this ground.

Having considered these defenses to Oishei, the court now turns to evaluate the patent's validity over the prior art. Broadly stated, the Oishei claims in issue reveal a windshield cleaning system having a power unit which may be actuated by a hand control for use of the wiper alone, and a washer unit which is operated by a separate actuator and which is connected to the wiper system by a coupling device in such a manner that actuation of the washer system will give conjoint use of both the washer and wiper systems. The wiper is to be stopped automatically after the washer action is terminated. Defendants' position on this aspect of validity, as revealed at pages 66–80 of its brief, may be summarized as follows: unless the Oishei claims are construed as calling for the exact type of coordinating mechanisms revealed by the patent then they must be construed as covering all types of coordination, and the prior art has already revealed several types of coordinating systems. That such a position would inure to the benefit of defendants cannot be doubted. Adoption of the first alternative would result in a finding of validity but non-infringement. Adoption of the second alternative would necessitate invalidating the patent, which would render the question of infringement academic. This invitation to construe the claims will be deferred until the question of infringement is taken up. For the present, the Oishei claims will be examined in the light of the prior art cited against them by defendants, namely, Horton Patent No. 2,206,814, West Patent No. 2,162,985, Neufeld Patent No. 2,702,918 (now Re. 24,507) and Marte Patent No. 2,856,626.

Horton, West and Marte all disclosed a form of coordination, so the concept was not new with Oishei. West and Marte were both limited to use with electric wipers and revealed nothing about coordination of washers with vacuum wipers. Oishei, on the other hand, reveals coordination of washers with either vacuum or electric wipers. Further, in West the wipers could not be turned on independently—the washer was always activated momentarily. Oishei provides for independent wiper action. In West the wiper had to be manually shut off. Marte does not employ two actuators for a single control as does Oishei; rather, there are two separate switches for the electric wiper motor.

Horton Patent No. 2,206,814, issued July 2, 1940, reveals a form of a coordinated washer-wiper system. Claim 5 of Horton sets out a control for the wiper motor interconnected with the washer control so that concurrent actuation could be given the washer and wiper or so that independent operation could be given the wiper. The specifications re-

veal that the washer control and the wiper control are combined in the control 34. Lines 11–14 of the specifications (page 2, col. 2) deal with the connection of these controls. "The interconnection between controls may be accomplished through a play movement, as by having the cleaner motor valve 35 slidably connected to the stem 36." Independent operation of the wiper was to be by a control combined with the combination control which could be operated without actuating the washer. Horton specifications also indicate that sequential operation was intended in that the wiper was to continue functioning after the washer terminated and until it was manually shut off, or the cleaner could be automatically shut off at the time that the washer stopped. The above operations were to be achieved solely by means of a single hand actuator.

While Oishei seeks to reach substantially the same result as Horton, there is a dissimilarity in means used to achieve this, and in some respects the results are different. In Oishei the wiper commences only after the windshield has been wetted; the wiper ceases only after the wetting has ceased. In Horton the wiper commenced action before the water was sprayed, and stopped before the windshield was dry. Oishei reveals a different operation wherein two actuators of the motor control are used instead of Horton's one, either of which can operate the wiper control through the inter-connecting coupler. This latter statement is also applicable to the Neufeld patent which combined both washer and wiper control in a single foot-operated device instead of a single hand-operated device such as found in Horton.

Thus, Oishei in providing for the conjoint use of a washer-wiper system functioning through the use of two separate actuators of a single wiper control, and selectively operable through a coupling mechanism, and with provision for automatically arresting the wiper, and capable of operating either vacuum or electric wipers, supplied to the art a new and novel invention which contained elements not previously found in the prior art. The claims in suit of the Oishei patent are accordingly held to be valid.

Trico charges that defendants' foot-operated washers infringe claims 4, 5, 12, 25 and 35 of the Oishei patent, which read as follows:

"4. A windshield cleaner comprising a wiper system having a control with a hand actuator, a washer system having a washing cycle of limited duration and including a pump having a foot actuator, an interconnecting system coupler opperatively connecting the foot actuator to the control as a secondary actuator for the latter and operable to give conjoint use of both systems by and upon the operation of the foot actuator alone and to continue the operation of the wiper system after the washing cycle by holding the foot actuator operative, and arresting means operable automatically upon the release of the foot actuator to arrest the wiper system."

"5. A windshield cleaner comprising a wiper system having a hand actuator and a foot actuator, a washer system operated by the foot actuator, an interconnecting coupler selectively operable to give either conjoint use of both systems by the foot actuator or independent use of the wiper system by the hand actuator, means predetermining the period of operation of the washer system, and means operable automatically to arrest the wiper system following the washer operation."

"12. A windshield cleaner having a wiper, a washer, a power unit operable to actuate the wiper, a control for the power unit, an actuator for the control accessible for hand actuation, a second actuator for the control accessible for foot actuation, coordinating means operatively connecting the control and the washer

for actuating the wiper and washer jointly, and means automatically arresting the wiper after the washer ceases operation."

"25. A windshield cleaner comprising a wiper system having a control, a washer system having a cycle of limited duration and provided with a foot actuator, and an interconnecting system coupler operatively connecting the washer system to the wiper system and including a flexible power transmitting member connected to the control to render the wiper system operative by actuating the foot actuator for a period of conjoint use and including means operable through said power transmitting member for automatically arresting the wiper system subsequent to the completion of the washer system operation."

"35. A windshield cleaner according to claim 25, wherein the washer system has an elastic bellows, the foot actuator is in the form of a pedal pivotally mounted on the bracket adjacent the bellows and overlying the same for compressing the bellows upon depression of the pedal to deliver washing fluid onto an associated windshield, said pedal having connection with said flexible power transmitting member for so rendering the wiper system operative upon depression of the pedal."

As noted earlier, only contributory infringement is charged since defendants do not make a complete windshield cleaning system as called for by the Oishei claims. The question of whether defendants can be guilty of contributory infringement has likewise been dealt with elsewhere. The accused devices, exemplified by exhibits EE–20, 30, 34, 38, 42, 45 and 48, may be described generally as consisting of bulb-type washers operated by a foot lever, to which is attached a bowden wire having at its end a square piece with a forked projection, which is designed to be connected to operate the motor control valve.

For purposes of determining whether such devices infringe it is first necessary to draw some conclusions from the previous paragraphs in which the Oishei patent was held to be valid over the prior art. Prior art against Oishei revealed that the idea of coordination of washers and wipers was old. The use of hand actuators to start the wiper motor was well known. Similarly, the use of a foot operated member with bowden connection to operate the wiper motor was disclosed previously by the Neufeld patent. Horton had disclosed sequential and conjoint operation. Marte had revealed delayed action of the wiper after the washer had stopped. Oishei's patentable advance over this prior art consisted in combining these old elements and adding thereto his coupling devices. In view of what was already known to the art about coordination, Oishei's advancement thereof, while patentable, was not a great breakthrough. On the contrary, it was merely a narrow advancement of the art, and consisted primarily, as noted above, of a new method of coordination.

Assessment of Oishei's contribution is important because it is determinative of the interpretation to be given the claims in suit. Specifically, the patent disclosure and the drawings reveal one type of coupling or coordinating system in Figs. 1–18 which may be described loosely as a gear system, and another type of coupling system in Figs. 19–23. The accused foot-operated devices do not show either of the coupling systems revealed in the patent disclosure. The claims call for "interconnecting system coupler", "interconnecting coupler", "coordinating means". Defendants take the position that the coupling means called for by the claims are limited to the coupling devices disclosed in the specifications and drawings. Plaintiff says that it was entitled to and was granted claims which are not limited to the coupling devices disclosed and which cover equivalent structures not specifically disclosed.

Two questions arise: 1) Which of these two interpretations is proper? 2) If the claims are not to be limited to

those coupling structures disclosed, is defendants' device an "equivalent" within the meaning of Section 112 of the patent laws?

On the question of interpretation the court takes a position which falls somewhere in between the positions advanced by the litigants. Plaintiff is not limited to claiming only those types of coupling devices revealed. On the other hand, plaintiff is not entitled to have the claims broadly construed. The court thinks that the claims of the Oishei patent should be narrowly construed. Several legal theories point toward this result. The first rule is that claims are limited by the prior art, and the prior art must be considered in construing the claims. In Smith v. Mid-Continent Inv. Co., 8 Cir., 1939, 106 F.2d 622, 624, the court made the point as follows:

"A third method [of determining the scope of a patent] is by examination of the prior art. This is so because the prior art is a field not open to discovery. Novelty, justifying a patent, must be found outside that field. No matter what the discovery asserted or claimed in the patent, such assertion or claims must be construed to be limited so as to exclude the prior art. In questions of the *scope* of a patent, the place of the prior art is to determine the 'range of equivalents' to be applied. If the discovery revealed and claimed is in a new field of endeavor or is a pronounced journey forward in an art, then the claims are entitled to be liberally construed, resulting in a wide range of equivalents; but if the discovery is in a crowded art and is merely a mincing step forward, the claims are restricted to a narrow range to avoid trespass upon the domain of others or of the public."

See Freeman v. Altvater, 8 Cir., 1943, 138 F.2d 854, 859.

 Having concluded that Oishei's invention was but a narrow advancement of the art it follows that his claims are entitled to only a narrow con-

struction. An additional doctrine also supporting this view is the rule that where the court is dealing with a combination patent in a crowded art the claims are to receive a narrow construction. General Bronze Corp v. Cupples Products Corp., 8 Cir., 1951, 189 F.2d 154, 159, Messler v. United States Rubber Co., 2 Cir., 1945, 148 F.2d 734.

The conclusion drawn from these rules is that the coupler or coordinating means called for by the claims must be narrowly construed to cover only those types of coupling mechanisms revealed in the specifications and drawings, and a narrow range of equivalents.

 On the question of infringement the central dispute concerns the coupling means. Defendants maintain that the accused devices do not contain coupling means or equivalents which infringe. The court agrees with this position. There is no similarity whatsoever between the bowden connection used by defendants and the coupler devices disclosed by the patent. It should be noted here that plaintiff has not commercialized any of the exact coupling structures disclosed. To hold that defendants are guilty of infringement for using a bowden wire to actuate a wiper motor is to remove from the public domain a common feature of the prior art. Plaintiff has endeavored to show that the forked projection at the end of the bowden wire is an infringing coupler. But ever since Neufeld bowden wires connected to footmembers have been used to actuate wiper motors. Even though Oishei disclosed a patentable invention the patent cannot be used to obtain a monopoly over something which was clearly old in the art. The range of equivalents of a patent cannot be extended to cover means which have clear antecedents in the prior art. Mason Corp. v. Halliburton, 10 Cir., 1941, 118 F.2d 729. Defendants' devices cannot, therefore, be treated as infringing "equivalents."

The court concludes that claims 4, 5, 12, 25 and 35 of the Oishei patent are not infringed.

In the previous section dealing with infringement of the Oishei patent by defendants' foot-operated washers the court set forth that Oishei, being merely a small advancement of the art, was not entitled to a broad interpretation and a wide range of equivalents, but should be narrowly construed, and that the prior art also limited the interpretation which could be given the claims. This same approach must be taken in evaluating the charge that defendants' 1958 Thunderbird washer infringes claims 3, 22 and 32 which do not call for foot-operated washers. As in the case of the foot-operated washers, the central issue here revolves around the coupling means called for by the claims. While the court has said that the Oishei claims are to receive a narrow interpretation it is not willing to go as far as defendants urge and hold that the coupler or coordinating means called for are limited to the types of coupling mechanisms shown in the specifications and drawings. More precisely, the court rejects defendants' argument that the claims are invalid unless restricted to an "automatic disconnecting action in the coordinating operation."

The claims under consideration read as follows:

"3. A windshield cleaner comprising a wiper system including a wiping blade and a connected motor with a manual control, a washer system including a delivery nozzle and a connected pump with a manual control, a coordinating control coupler operatively connecting the wiper control to the other and selectively operable for either the conjoint use of both systems or the sole use of one system, said coupler having relatively movable parts each connected to a respective control and means operable to detachably connect said parts to secure such conjoint use or sole use, said washer system having a cycle of operation of shorter duration than that of the wiper system and the wiper system having an independent action following the cessation of the washer delivery, and

means operable thereafter to automatically arrest the wiping blade."

"22. A windshield cleaner comprising a wiper system having a wiper stroking back and forth, a washer system having means for applying a liquid solvent to a windshield surface while the wiper is stroking and then stopping the solvent application, an inter-connecting system coupler dependent upon the setting of the washer system in operation and operable to start the wiper system in operation to give a period of conjoint use of both systems, control means selectively operable either to set the washer system in operation and thereby render the coupler operative or to secure an independent actuation of the wiper system alone, and time-controlled means responsive to washer system operation and operable to continue the stroking of the wiper for a time interval following the period of conjoint use and after stopping of the solvent application by the washer system."

"32. A coordinated windshield cleaner comprising a wiper unit having a control for starting and stopping the unit, a washer unit having a control, primary and secondary actuators for the wiper control, one of said actuators being operatively connected to the wiper control to move it to its starting position only and the other actuator being directly connected to the wiper control for moving it to and from its starting position independently of said one actuator, said secondary actuator being operatively connected to the washer control for responding thereto in bringing the two units into overlapping cycles of operation, and coordinator means operatively connecting said one actuator to said other actuator to establish a driving connection therebetween for returning the wiper control to its stopping position, by said one actuator."

■ Chart 10 of defendants' expert, Macklin, sets out those elements of the claims which defendants assert are missing from the Thunderbird washer. From the court's inspection of the device and from the testimony concerning it, a general statement can be made concerning its operation. By pressing the hand control for the washer a water pump is operated to force the liquid onto the windshield. This also causes a vacuum to operate the wiper motor control member which causes the wipers to operate. When the control button is released the liquid stops, with the wiper continuing for a short period thereafter, and stopping automatically. The system also contains another hand actuator which can be used to operate the wiper only. The coordinating coupler used to achieve either conjoint operation of washer and wipers or individual operation of wipers in the Thunderbird washer can be seen in Exhibit EE–73. A sample of the coordinating mechanism, as Oishei revealed it, can be seen in Figs. 21–23 of the patent. From a study of the patent, the drawings, the testimony, and from observation of the operation of the accused structure the court is of the opinion that the 1958 Thunderbird washer of defendants infringes claims 3, 22 and 32 of the Oishei patent. Defendants' device has a coupler which connects the wiper control to the washer control and which can be selectively operated for conjoint use of the washer and wiper systems or sole use of the wiper system. The parts of this coupler are relatively movable, one part being connected to the manual washer control, and the other connected to the manual wiper control. The coupler slide of the accused device is detachably connected to the motor valve in such a way that either conjoint or sole use may be achieved. In the accused structure there is found a bleed which allows the wiper to continue for a period after the washer has stopped. The 1958 Thunderbird washer is, therefore, the substantial equivalent of the invention revealed in claims 3, 22 and 32 of the Oishei patent and, notwithstanding the narrow interpretation to which Oishei is entitled, the Delman device infringes those claims.

"Infringement may not be avoided by making a device which differs in form if the infringer appropriates the principle and mode of operation of the patent device and obtains its result by the same or equivalent means. This rule applies even when the claim is narrowly construed if the alleged infringing device is within the narrow construction." Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 1938, 99 F.2d 1, 5.

### Horton Patent Number 2,206,814, Plaintiff's Exhibit BB–3

In its discussion of the Horton patent the court will proceed as it did in Oishei and consider various defenses raised by defendants before turning to validity over the prior art and infringement.

The defense that defendants cannot be guilty of contributory infringement was dealt with when Oishei was discussed and the conclusion reached (that defendants *can* be guilty of contributory infringement) is likewise controlling as to the charge of contributory infringement of Horton.

In the introductory paragraphs of this opinion it was noted that in 1949 Trico brought suit against Delman for infringement of the Horton patent, charging infringement of claims 9, 13 and 14. In the instant action Trico has again sued upon the same Horton patent, but now charges infringement of claims 5 and 6. As a defense defendants have stated the following proposition:

"Plaintiff is barred from any relief under the Horton Patent because of res adjudicata by virtue of previous decisions (85 F.Supp. 393 affirmed 180 F.2d 529) involving the same parties in this Circuit holding the Horton Patent invalid."

On April 16, 1949 Judge Dewey filed a memorandum opinion which listed as a conclusion of law that "United States Letters Patent No. 2,206,814 is invalid in law * * *." [85 F.Supp. 396.] Sub-

sequently, upon motion by Trico, an order dated May 11, 1949 was entered which corrected the above conclusion of law as follows: "United States Letters Patent No. 2,206,814 is invalid in law as to claims 9, 13, 14. * * *" Thereafter, on May 23, 1949 the defendants petitioned the court for cancellation of the modifying order of May 11, 1949, alleging as one ground therefor that "The Court had authority and jurisdiction to find said patents invalid in toto as it so did in its decision and main judgment of April 16, 1949." This motion was overruled by an order of June 6, 1949.

On appeal the propriety of the district court's action in so limiting its conclusions was considered and dealt with as follows:

"We are also of the opinion that the District Court correctly limited its findings and judgment to the patent claims which were relied upon by the plaintiff, although we regard that question as largely academic." 180 F.2d at page 530.

Clearly the earlier suit between these litigants did not hold that the entire Horton patent was invalid. That decision, therefore, does not bar plaintiff from seeking relief upon claims 5 and 6 of the Horton patent, since those claims cannot be held to have been tested in the earlier suit. It is accordingly held that plaintiff is not barred from relief under the Horton patent because of res judicata.

In opposition to the granting of relief to the plaintiff defendants urge that plaintiff's demands should be denied for want of equity. Defendants complain that "Plaintiff is wrongfully using its patents in a program of unfair competition directed to driving Defendants, Delman, out of business." Authority is cited to establish that equity may grant relief to a party who is being repeatedly harassed by unfounded suits brought by a dominant concern in the industry. This objection is raised against all of plaintiff's suit, but is dealt with in connection with the Horton patent since the action insofar as it is based on Horton is argued by defendants as showing unfair competition.

To support its charge defendants say that the instant suit on the Horton patent No. 2,206,814 is an "indication of the Plaintiff's harassment of the Defendants" since "that Horton patent * * * was previously litigated against Delman * * *." In view of the holding of this court that the 1949 suit on the Horton patent is not res judicata as to claims 5 and 6 under which relief is now sought it is concluded that this argument of defendants is wholly without merit.

Defendants next point to plaintiff's answer to Request for Admission 78 (which inquired as to another Oishei patent not here in suit) as evidence of plaintiff's intention to harass defendants by a multiplicity of suits. In its answer to that request plaintiff said:

"R.A. 78. In the present status of this suit defendants are not charged with infringement of plaintiff's patent No. 2,769,194. However, plaintiff reserves the right to institute such further action as may be advised under such patent or any other patents issuing subsequent to the institution of the present suit."

Defendants urge the court that the above answer is a "brazen veiled threat of further suits." The court thinks that a charge of "wrongful harassment" based upon this answer is utterly without merit.

The court concludes that there is no basis whatsoever for denying plaintiff equitable relief on the ground of unfair competition and wrongful harassment. Such a drastic step could not possibly be supported on the slender grounds advanced by defendants.

The Horton patent issued July 2, 1940 and expired July 2, 1957. Plaintiff is seeking damages for alleged contributory infringement of claims 5 and 6.

Defendants challenge the validity of this patent. Before examining this defense the claims in suit are set out:

"5. A window clearing system comprising, in combination with a

wiper, a motor for moving the same back and forth on the window surface, and a control for the motor, motor means for spraying a fluid on the window surface for loosening matter thereon in the path of the wiper, a control for said spraying means interconnected with the first control for concurrent actuation therewith, and means permitting independent operation of said first control.

"6. A window clearing system comprising, in combination with a wiper movable back and forth over the widow surface, means for spraying a liquid in the path of the wiper, power means for supplying the spraying means with a measured quantity of the liquid under a substantially uniform pressure, and means operable by a moving part of said supplying means for controlling the actuation of said wiper."

In urging the invalidity of these claims the defendants rely primarily upon plaintiff's earlier West Patent No. 2,162,985. The general objective of the West patent can be seen from the following language taken from page 1, Col. 1, lines 6–17 of that patent.

"My invention * * * resides in novel means for spraying a substantial width of the windshield with a pulsating spray of a cleaning fluid in cooperative combination with wiping means for cleaning said windshield while being so sprayed, the operation of said spraying means being subject to the control of the operator by the simple expedient of closing or opening a conveniently positioned electric switch."

It is clear that so much of the Horton claims as relates to the idea of coordinating washer and wiper action was anticipated by the earlier West patent. Additionally, certain elements of Horton are to be found in West. Specifically, that part of claim 5 calling for "motor means for spraying a fluid on the window surface", and that part of claim 6 calling for "power means for supplying the spraying

means" are anticipated by that part of the West device illustrated in Fig. 5 of the West patent, wherein an armature 30 discharges fluid from bellows 26 and 26' causing the liquid to be pumped onto the windshield. The control for the motor called for in Claim 5 (shown in Fig. 3 of Horton, 35) finds response in Fig. 2 of West, in the contact spring 42 and conical contact member 46. Interconnection of the wiper control with the washer control to achieve concurrent actuation (34 & 35 of Horton Fig. 3) which is called for by Claim 5 can be found in West device (see 46 and 41 of Fig. 2). That part of claim 5 calling for means permitting independent operation of the wiper motor control is not to be found in West since the testimony established that in West it was impossible to turn on the wiper without also turning on the washer momentarily. But the method disclosed by Horton to achieve this, consisting of the threaded connection 48 between control 34 and stem 36 cannot be said to be anything more than the product of mechanical skill; hence, its absence from West does not add anything to Horton. That part of Claim 6 calling for the supplying the spraying means with a "measured quantity" of fluid is not to be found in West, since control of the amount of liquid to be sprayed on the windshield is determined in West by the length of time the operator continues to press the actuating knob 45. Again, however, this is immaterial, since the court holds that the spring motor device of Horton used to achieve this measured spray is nothing more than a product of what any skilled mechanic could have achieved. The same is true regarding that part of claim 6 calling for "means operable by a moving part of said supplying means for controlling the actuation of said wiper," seen as 35 in Fig. 3 of Horton.

█ The court concludes that claims 5 and 6 of the Horton patent are invalid in that a portion of the elements were anticipated by the prior West patent while the remaining elements disclose nothing more than the product of mechanical skill.

Although the court has held that the previous litigation is not res judicata upon Claims 5 and 6, it nevertheless takes cognizance of the comments of Judge Dewey directed at claims 9, 13, and 14 of the Horton patent. While those comments are not binding or determinative in the instant case the court feels that they well state the view which this court takes toward Claims 5 and 6.

"This Horton patent comes in the class of those combinations which are the result of an idea by the superintendent of an organization to supply an anticipated advancement in the art. The works of Mr. Horton, as mechanical engineer for the plaintiff company, taking into consideration his skill and knowledge of mechanics generally, comprise nothing more than ordinary mechanical skill and at most are devoid of inventive genius and do not comprise any new and useful art, machine, manufacture, or composition of matter." 85 F.Supp. at page 395.

Plaintiff charges infringement of the Horton claims by defendants' foot-operated bulb washer structures. The crucial question here involves the proper interpretation of "motor means" as used in Claim 5 and "power means" as used in Claim 6. It is the position of the plaintiff that the rubber bulb found in the accused structures is a "motor means" within the meaning of Claim 5, and a "power means" within the meaning of Claim 6. Defendants' position is that these terms refer solely to the spring motor shown in Horton Fig. 3, and that since no such device is found in the accused structures the defendants cannot be guilty of infringement.

In the last paragraph of the Horton specification (Page 2, lines 49–66), the following language is found:

"The feeding of the liquid to the jet is *automatic and independent of manual control.*

\* \* \* \* \*

"The result is, in effect, an artificial shower of the liquid, limited in duration, under a definite pressure, and automatically terminated, *all without dependency on the human factor.*" (Emphasis added.)

The testimony discloses that it is the power of the spring that ejects the water in Horton. The file history of the application also reveals that the claims were rejected and thereafter were amended to include the terms "motor" and "power". And the file history also reveals that the applicant sought to distinguish his structure from the prior art as follows:

"Hedley does not show a power operated means for forcibly spraying the liquid as called for.

\* \* \* \* \* \*

"These claims are further believed to be allowable over Bumpass in view of Prescott and Phillips, Bumpass relying wholly upon manual effort to eject the fluid onto the window surface.

"Bumpass does not deliver the liquid at a uniform pressure or in an automatic manner independent of manual effort."

In the Oishei patent in suit, No. 2,743,473, reference is made to the Horton patent (Col. 1, lines 26–30).

"Therein [referring to Horton] a wiper unit is started automatically by the manual retraction of a pump plunger on its liquid intaking stroke. During this stroke a spring is distorted to store up energy for subsequent expenditure, after the release of the plunger, to effect the liquid discharging stroke \* \* \*."

It is clear that the "motor means" and "power means" called for by the claims in Horton refer to a type of mechanism such as the spring 20 shown in Fig. 3 of Horton which forces the plunger 15 forward to eject the water.

Defendants' accused devices are of the rubber bulb type which are foot actuated. These foot-operated bulb-type pumps eject liquid solely by foot pressure upon them. There is no spring motor type of element contained in them, or anything even vaguely resembling such. Since the proper interpretation of Horton

is that the "motor means" and "power means" refer to such a spring type of device the absence of such a device in defendants' bulb-type washers leads to the conclusion that there is no infringement of Horton claims 5 and 6.

"The law is well settled that when the accused structure omits an essential element of a patent, without the substitution of an equivalent, operating substantially in the same way to achieve practically the same result, there is no infringement." Kay Patents Corp. v. Martin Supply Co., 4 Cir., 1953, 202 F.2d 47, 51.

### Neufeld Reissue Patent Re. 24,507, Defendant's Exhibit 132

Defendants have counterclaimed for alleged infringement of their Neufeld patent, Claims 6, 7, 8 and 9. Plaintiff has raised the usual issue of validity, and, in addition, challenges validity on the ground that 35 U.S.C.A. § 102(b) was not complied with. That portion of the patent laws provides that a patent is invalid if the invention was "on sale in this country, more than one year prior to the date of the application for patent * *." This latter defense will be dealt with first.

Application for the Neufeld patent was filed June 7, 1951. A series of letters introduced in evidence reveals that Delman sent samples of this device to Ford, AC Spark Plug Division of General Motors, Studebaker, and the Fisher Body Division of General Motors over a year prior to June 7, 1951. There is, in addition, certain testimony of Neufeld which can be taken to mean that he considered that efforts were being made to sell the device. Defendants take the position that the samples being submitted to the car companies were not being offered for sale but only for testing and trade reaction. In view of the fact that the device was not on hand and ready for delivery, and that it had not been delivered or accepted it is held that the device was not "on sale" within the meaning of the statute, and the patent is not invalid on this ground. This view is supported by

the better reasoned cases. E.g., B. F. Sturtevant Company v. Massachusetts Hair & Felt Co., 1 Cir., 1941, 124 F.2d 95; Burke Elec. Co. v. Independent Pneumatic Tool Co., 2 Cir., 234 F. 93. The correct statement of the rule is found in F. E. Myers & Brother Co. v. Goulds Pumps, D.C.W.D.N.Y.1950, 91 F.Supp. 475:

"The rule of law is that 'if the article is not on hand, ready for delivery, it cannot be said to be "on sale." ' Connecticut Paper Products v. New York Paper Co., D.C., 39 F.Supp. 127, 133. 'If patented articles are on hand ready to be delivered to any purchaser, they are on sale, whether any of them has been sold or not. But, if they are not, they cannot be said to be on sale within the meaning of the act, * *.' Burke Electric Co. v. Independent Pneumatic Tool Co., 2 Cir., 234 F. 93. '* * * but where a specimen of an invention is built or made to order, it is not "on sale" till it is completed, delivered, and accepted.' Walker on Patents, supra, sec. 85, p. 355. McCreery Engineering Co. v. Massachusetts Fan Co., 1 Cir., 195 F. 498." 91 F.Supp. at page 497.

In general, this patent describes a foot-operated device which can be used to operate separately either the washer or the wiper, or which can be used to operate both washer and wiper concurrently. A treadle 57 is positioned atop a plunger 24 and when these are depressed as a unit washer action results. A bowden wire 64 is attached to the treadle 57 and the working end 77 of the bowden wire is attached to the valve 32 of the wiper motor. The treadle 57 can be pivoted independently of any movement of the plunger 24 and pivoting of the treadle 57 operates the wipers. By depressing the treadle 57 and plunger 24 and at the same time pivoting the treadle both the washer and wiper can be brought into operation. This general description can be made more specific by an examination of the language of the patent. Col. 3, lines 70–75, Col. 4, lines 1–10 read as

follows (brackets in reissue indicating matter omitted from original patent are omitted):

"This pivoted movement of the treadle member 57 takes place independently of any reciprocal movement of the plunger 24 so that only the operation of the wipers 28 is controlled on pivoted movement of the treadle 57.

"By pressing downwardly on the treadle 57, at any pivotally moved position therefor, the plunger 24 and treadle 57 are depressed as a unit to in turn provide for a supply of fluid under pressure to the nozzle 26. Thus fluid can be supplied to the nozzle 26 independently of the operation of the wipers 28, or the wipers 28 can be operated independently of any supply of fluid to the nozzle 26. By merely depressing the treadle 57 and plunger 24 as a unit, concurrently with pivotally moving the treadle 57 to its *full* line position shown in Fig. 4, the washer unit and the wiper unit are set into operation at the same time."

In opposition to validity plaintiff states the following proposition:

"The Neufeld Patent is Invalid for Obviousness, Lack of Invention over the Prior Art and Complete Absence of Utility."

The prior art discloses that prior to June 7, 1951, the application date of the original Neufeld patent, the use of foot-operated washers was quite well known. Prior patents of Bumpass, Burress, Marks, Horton, Zabilka and Olin all revealed some type of foot-operated washer. Prior art also discloses the use of foot-operated control devices which could be used for operating two units. A good example is the Sanford Patent, No. 2,068,962, which was applied for in 1935. That patent says in Col. 1, lines 5–11:

"The principal object of the invention is to provide a compact and effective foot-operated pedal mechanism for selectively operating, either successively, intermittently or con-currently, a plurality of controls, such, for example, as the throttle, clutch, brakes and transmission of a conventional automobile."

There is disclosed a bowden connection operated by rocking the foot forward on the pedal mechanism and which may be connected to the throttle and clutch control, or to the throttle and a valve for controlling the change-speed transmission. A downward pressure on the pedal operates the brake.

In Vaughn Patent, No. 3,332,122, applied for in 1941, there is disclosed a brake and motor control device, consisting of a treadle mounted upon a brake actuating foot lever and arranged so that the foot treadle can be pivoted on the foot lever. At the bottom of the treadle or foot plate there is attached a control wire which is connected so as to control the throttle valve. When the brake is off, the foot plate can be tilted forward which pulls the wire backward to open the throttle. When the brake is applied the wire moves forward to close the throttle. A somewhat similar device is disclosed in Winters Patent, No. 2,073,772. Thus it appears that use of pivoting foot levers with bowden connections to operate two units separately or concurrently was not a new idea.

The question appears then, whether combining the old idea of a foot-operated washer with the old idea of a foot-operated lever with bowden connection to operate another unit, in this case the wiper, is something not obvious to a person with ordinary skill in the art. The court thinks it is not. On the basis of prior art disclosures any person with ordinary skill in the art could easily have constructed a device such as that revealed in Neufeld. For this lack of invention claims 6, 7, 8 and 9 of the Neufeld patent are held invalid. The court agrees with Judge Clark of the Court of Appeals for the Second Circuit that "[I]t is now too late to urge that an unstartling regrouping of old elements, which does not 'rise above the commonplace' or demonstrate 'originality which is born of the inven-

tive faculty,' may be called 'invention' for the purposes of patent validity." Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 1950, 184 F.2d 652, 654.

Defendants contend that plaintiff's foot lever pump assembly directly infringes Claims 6, 7, 8 and 9 of Neufeld Reissue patent 24,507. These claims read as follows:

"6. For use with a vehicle having a floorboard, a windshield wiping system including wipers and a power unit for operating said wipers, and a windshield washing unit including a nozzle and a pump assembly mounted on said floorboard, said pump assembly including a working member which is depressed to supply fluid under pressure to said nozzle, a control device for concurrently operating said two units including an actuating lever for depressing said working member, means mounting said lever on said pump assembly for pivotal movement relatively to said pump assembly, and a flexible member connected to and extended between said actuating lever and said power unit for controlling the operation of said power unit in response to a pivotal movement of said actuating lever.

"7. The structure of claim 6 further characterized by the pump working member comprising a depressible plunger and by said lever comprising a pedal engaging said plunger and movable to operate said wiper motor unit and to coordinate operation of said washer unit therewith.

"8. The structure of claim 6 further characterized by the pump working member comprising a depressible plunger and by said lever comprising a pedal engaging said plunger and movable to operate said wiper motor unit and to coordinate operation of said washer unit therewith, said pedal also being movable to arrest operation of said wiper motor unit after the spraying of washing fluid through the washer nozzle.

"9. The structure of claim 6 further characterized by said lever coordinating operation of the nozzle discharge with the movement of the wipers."

Plaintiff's first defense, stated at page 81 of its brief, is a further attack on validity.

"If Claims 6 through 9 of the Neufeld Patent were Deemed to Read on Trico's Foot-Operated Washers, Such Claims would be Invalid Because not Applied For Until More Than a Year After the Trico Device Was on the Market."

It appears from the evidence that when the Neufeld patent was originally applied for it contained five claims. Each of those claims called for "a control device for selectively or concurrently operating" the washer unit and the wiper unit. Trico's accused device may be described generally as a foot-operated pump actuated by a lever and having a bowden wire designed to be connected to the valve of the wiper motor so that by actuation of the foot lever both the washer and wiper are operated concurrently. It contains nothing which would allow independent operation of the wiper or independent operation of the washer. Such a structure obviously does not infringe claims calling for a control device which allows selective operation of the washer and/or the wiper. Claim 6 here in suit was applied for by Supplemental Amendment filed November 4, 1953. It is to be noted that Claims 6, unlike the earlier 5 claims, does not call for "a control device for selectively or concurrently operating" the units. Rather, it claims a "control device for concurrently operating said two units." No mention is made of "selective" operation. Claims 7, 8 and 9 were added by the reissue. Trico's device had been offered to Ford in August of 1952. Thus, it was over a year later that defendants made application to have Claim 6 included. Plaintiff's position is that this was an "effort to put into an application on an entirely different device, **a**

description of the elements of the Trico device." Plaintiff urges that claim 6 is void and ineffective.

■ The question arising then is whether it was permissible to amend the Neufeld application. The general rule is that an applicant is permitted to add new claims while his application is pending if the new claim is supported by the disclosure of the original application and the amendment does not inject new matter. E.g. Artmoore Co. v. Dayless Mfg. Co., D.C.N.D.Ill.1952, 109 F.Supp. 181, affirmed in part and reversed in part on other grounds, 7 Cir., 208 F.2d 1, certiorari denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075. Although plaintiff urges that the added claim is not supported by the disclosure of the original application, the court holds otherwise, believing that the claim calling for a control device for concurrently operating the washer and wiper units was disclosed in the application which revealed both selective and concurrent operation. When the claim was added by amendment no changes were made in the specifications or drawings, and there was not, therefore, an injection of new matter into the application. Does the fact that this claim was sought over a year after plaintiff had disclosed its device to Ford in some way preclude the amendment which is otherwise proper? In urging that it does plaintiff cites Railway Co. v. Sayles, 1878, 97 U.S. 554, 24 L.Ed. 1053; Schriber-Schroth v. Cleveland Trust Co., 1938, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; and Muncie Gear Works v. Outboard Marine & Mfg. Co., 1942, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171. The following language of the Sayles case is quoted:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the mean time, gone into public use." 97 U.S. at pages 563–564, 24 L.Ed. 1053.

In the Schriber-Schroth case it was said that

"the application for a patent cannot be broadened by amendment so as to embrace an invention not described in the application as filed, at least when adverse rights of the public have intervened." 305 U.S. at page 57, 59 S.Ct. at page 13, 83 L.Ed. 34.

Since the defendants made no changes in the original disclosure which fully supported the allowance of Claim 6, the rules laid down by the cases cited have not been contravened since in those cases the Court was referring to instances in which the disclosures were added to.

■ Under these circumstances the court holds that it was entirely proper for the Neufeld application to be amended to add Claim 6. See Engineering Development Laboratories v. Radio Corp. of America, 2 Cir., 1946, 153 F.2d 523, 526. For a general discussion of the entire problem see 69 C.J.S. Patents § 113(c) (d). The court is unwilling to hold Claim 6 invalid as being an improper enlargement of the scope of the patent or as being unsupported by the original application. The Trico devices, however, do not infringe the claims. The court agrees with plaintiff that the accused structure differs in means, operation and result from Neufeld, even though the accused structures literally infringe. The chart at page 86 of plaintiff's brief points up these differences, and the court is in agreement with what is shown there. Accordingly, it is adopted as a part of this opinion, and included herein. It reads as follows:

*Neufeld*

1. There is only one actuator for the wiper, and this is operated by foot.

2. When the driver wants to operate the wiper without the washer he can do this by foot, without removing a hand from the steering wheel.

3. The washer can be operated without operating the wiper.

4. The washer and wiper cannot be operated concurrently unless the driver performs two separate acts —pushing down the plunger, and pivoting the treadle.

5. When the wiper is turned on, whether concurrently with the operation of the washer or without washer operation, it will run until separately turned off.

6. There is no lever action to multiply the foot power used to depress the pump plunger ("working member").

7. A selectively operable foot "control device" is used "so as to operate the wipers on pivotal actuation thereof, and to supply fluid under pressure to the windshield or linear actuation thereof."

### Trico

1. For separate actuation of the wiper system two actuators are required—one operated by hand and one operated by foot.

2. When the driver wants to operate the wiper without the washer, he can do so only by using the primary, hand-operated actuator.

3. The washer cannot be operated without operating the wiper.

4. The wiper is automatically activated every time the washer is operated.

5. When the washer is operated, the wiper is not only automatically turned on but also automatically turned off.

6. There is an actuating lever for depressing the pump plunger ("working member"), multiplying the foot power used by the driver.

7. The foot-operated lever is not capable of selective operation nor of linear movement but only of non-selective lever pivotal movement which automatically operates both washer and wiper.

Where an accused device operates in a substantially different manner it does not infringe, even though it may respond to the literal language of the claims. Westinghouse v. Boyden Power Brake Co., 1898, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, expounded this doctrine in the following language:

"We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. [Citing cases] The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the letter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent." 170 U.S. at page 568, 18 S.Ct. at page 722.

#### Webb Patent, No. 2,703,127, Defendants' Exhibit 133

Defendants have counterclaimed against plaintiff for alleged infringement of Webb patent No. 2,703,127, Claim 1, which describes a plastic bag for holding the liquid which is sprayed on the windshield by the washer. Claim 1 reads as follows:

"1. For use in a windshield clearing system for an automobile, a fluid container adapted to be attached to the fire wall of the automobile, said container comprising a pair of side walls positioned adjacent each other in a back to back relation, said walls being in a fluid sealed relation with each other along their corresponding edges whereby to form a fluid chamber between said walls, with one of said walls being constructed of a flexible and stretchable plastic material and the other of said walls being constructed of a non-stretchable fibre cloth impregnated with plastic, a fluid inlet formed on said container adjacent the top end thereof, a fluid outlet for said con-

tainer, and an elongated liquid level gauge formed on said front wall."

■ 35 U.S.C.A. § 103 provides in part that a "patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The prior art in evidence against the Webb patent clearly indicates that fluid reservoirs with flexible walls, fluid inlets and outlets, and fluid sealed edges are old. It also discloses such devices with one wall more flexible than the other; it discloses containers with transparent portions forming a window. The Webb patent is basically nothing more than a combination of these old elements. Whatever differences Webb provides over the earlier art were clearly obvious to anyone skilled in the art. Claim 1 of Webb patent No. 2,703,127 is invalid.

If, however, the Webb patent should be held valid then it is clearly infringed by such devices as the Trico Washer Bag, Exhibit EE–97. Plaintiff seeks to avoid liability for infringement by distinguishing its bag in certain particulars. It is claimed by plaintiff that its bag does not have one wall of flexible and stretchable plastic material and the other of a nonstretchable material. However, an examination of the bag is revealing on this point; it shows that the Trico bag does contain such characteristics. Plaintiff also claims that its bags do not have "an elongated liquid level gauge." However, the Trico bags contain transparent letterings and markings positioned on the front of the bag which serve the same function as "an elongated liquid level gauge" and in substantially the same manner. Finally, there is found in the Trico bag a fluid inlet and a fluid outlet combined in the one opening in the top of the Trico bag which corresponds to the language of the claim which calls for "a fluid inlet formed on said container adjacent the top end thereof, a fluid outlet for said container. * * *" The court holds that plaintiff's device is an infringement of Claim 1 of defendants' Webb patent.

Before concluding, the court should observe that because of the amount of space needed to comment upon what are considered the essential matters involved it is impracticable to also discuss each and every point raised by the parties in their respective briefs. However, all of the arguments presented have been carefully scrutinized and considered. There is nothing in any of the arguments, which have not been referred to above and specifically discussed which change the findings and conclusions herein expressed.

This opinion will stand as the court's findings of fact and conclusions of law. A separate judgment and order of the court is this day being filed.